Filed 8/24/20 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TIMOTHY KING,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>    Defendant and Appellant. | C085276<br><br>(Super. Ct. No. 34201300154644CUDFGDS)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 28, 2020, be modified. We address the arguments in the order presented by U.S. Bank in its petition for rehearing as follows:

1.      On page 8, the first FULL paragraph, second sentence, that begins "McGovern, however, confirmed that" delete the word "an" before the word "understanding" and add it its place the words "a thorough" so that the second sentence

1

reads: McGovern, however, confirmed that, at the time of her deposition, she still did not have a thorough understanding of what internal and external initiative meetings were and she never contacted anyone during the investigation to help her understand the definition of an initiative meeting.

2. On page 9, add the following paragraph before the first FULL paragraph:

In its petition for rehearing, U.S. Bank argues the summary of McGovern's testimony that "it was not necessary to have more than one person at an initiative meeting" and "[a]lthough it was preferable to include product partners at such meetings, it was not required" disregards the evidence and testimony provided by "employees whom McGovern interviewed." U.S. Bank recites testimony presented by several trial witnesses regarding initiative meetings. This portion of the opinion recites *McGovern's testimony*. U.S. Bank does not assert the recitation of McGovern's testimony is unsupported by the record. We see no reason to modify the opinion.

3. On page 22, add the following paragraph as the fourth FULL paragraph under heading 4 "Neal":

In its petition for rehearing, U.S. Bank argues the foregoing statement regarding Neal's understanding of initiative meetings misstates Neal's testimony. U.S. Bank believes Neal testified "she did not have an understanding of 'what an external [building deeper relationships] meeting was.' " During Neal's testimony, she testified an initiative meeting was "a meeting that would include all of the product partners, the relationship managers, and portfolio managers were kind of optional." When asked whether she had an understanding of what external and internal initiative meetings were at the time she spoke to McGovern, Neal said she did not. Neal confirmed she "didn't know what an internal versus an external [initiative meeting] was." We see no reason to modify the opinion.

4. On page 29, add the following paragraph after the second FULL paragraph:

U.S. Bank argues in its petition for rehearing that, in noting some of Thakur's accusations were contradicted by others to support the conclusion "McGovern knew Thakur was an unreliable source," the opinion fails to consider and discuss testimony corroborating Thakur's claims. We do not reweigh the evidence on appeal. Our review is limited to whether there was substantial evidence in the record to support the jury's finding of malice. (*Sanborn v. Chronicle Publishing Co.* (1976) 18 Cal.3d 406, 414.) We thus summarize the evidence in support of the verdict.

5. On page 30, delete the first FULL paragraph and replace it with:

As another example, the investigation into the vacation allegation also demonstrates a deliberate failure to investigate. Gerlach acknowledged at trial that they (human resources) should have obtained information from someone with responsibility for recording King's vacation before concluding King "stole vacation time." Although the vacation records showed King was paid out some hours in 2010, 2011, and 2012, it also showed he took a substantial portion of his 160 hours of vacation in each of those years. The jury further heard McGovern's deposition testimony that she took Flinn's statement that King told Flinn he (King) got paid for vacation and "it's a nice check" " 'to mean that Mr. King did not report vacation in order . . . to get paid out for it.' " McGovern, however, acknowledged she knew of no evidence King was taking vacation and not reporting it and no one said King said to take vacation and not report it.

6. On page 11, the first FULL paragraph, after the first sentence that begins "McGovern relayed the findings," add the following footnote:

In its petition for rehearing, U.S. Bank asserts the passage describing the conversation that follows was "drawn from a question by King's counsel that does not refer to any particular meeting" and "conflicts with the evidence regarding the meetings among McGovern, Gerlach, and Walker." The testimony discussed in this portion of the opinion is drawn from McGovern's testimony alone; it does not consider any testimony

by Gerlach and Walker.  McGovern testified:  "On December 19th is when Ms. Gerlach and myself met with Mr. Walker to let him know the information that had been gathered in the investigation."  McGovern explained her typed notes in trial exhibit 32 reflected what she had discussed with Walker and Gerlach.  Those notes are in the appellant's appendix at pages 224 and 225.  McGovern's testimony regarding what she told Gerlach and Walker "about [her] findings regarding Mr. King" mirrored in substantial part the information contained in McGovern's typed notes.  Gerlach's dispute with regard to the dates and substance of the conversations between herself, McGovern, and Walker are addressed in the portion of the factual and procedural background pertaining to *Gerlach's* trial testimony.

7.      On page 11, the last paragraph, after the first sentence that begins "McGovern did not ask Walker," add the following footnote:

In its petition for rehearing, U.S. Bank argues this statement is inaccurate because the record shows Walker spoke to King about the initiative reports "at McGovern's request."  None of the record citations provided by U.S. Bank supports its position that *McGovern testified* (which is what is summarized here) that *she* asked Walker to speak to King about the initiative reports.  At trial, McGovern was asked:  "Did you ask Mr. Walker to speak to anyone or gather any documents, look at any reports?"  McGovern answered:  "I don't recall asking Mr. Walker to do so."  As U.S. Bank notes, in footnote 6 *post* (now footnote 8), we explained that, in her *deposition*, McGovern recalled asking Walker to address two issues with King:  the initiative reports and a scorecard issue.

8.      On page 35, add the following to the end of footnote 10 (now footnote 12):

In its petition for rehearing, U.S. Bank asks us to delete this footnote because it believes it "made the same point in its opening brief" and thus the argument was not raised for the first time in its reply brief.  We disagree.  In its opening brief, U.S. Bank

4

argued the 2012 Plan provided the *payment* of a bonus required an employee to be employed with the bank on the date the bonus was paid and thus "[t]he implied covenant cannot impose a *duty to pay* a bonus that contradicts the plan's express terms." (Italics added.)  It further argued King became ineligible to *receive* a bonus due to his termination.  At no point in its opening brief, as noted *ante* (which U.S. Bank does not challenge), did U.S. Bank challenge the *jury's finding* that King had *earned* a bonus in 2012.

9.      On page 50, add the following paragraphs after the first FULL paragraph before heading 3:

U.S. Bank asserts it had argued in the trial court in its memorandum of points and authorities in support of the motion for judgment notwithstanding the verdict and request for new trial that, even if the reputation damages were not " 'purely duplicative,' " the damages were " 'excessive.' "  U.S. Bank believes the correct remedy is to remand for the trial court to consider whether the reputation damages were excessive based on insufficient evidence because it is "an argument that the trial court did not reach and that this court implicitly agreed would have merit by noting that 'King introduced no evidence of *actual* damage to his reputation.' "  We disagree.

First, our statement that King introduced no evidence of actual damage to his reputation does not signal the reputation damages were excessive.  That issue is not before us on appeal.  Second, this is the first time U.S. Bank has presented this argument; it did not request remand in its response to the cross-appeal.  We do not consider new arguments asserted in a petition for rehearing.  (*City of Saratoga v. Huff* (1972) 24 Cal.App.3d 978, 1006 [" 'The courts have on numerous occasions declared that they will not grant rehearings on points newly urged in the petition.  It is the duty of counsel to see that all points are properly presented in the original briefs or argument, before

submission' "].)  Third, U.S. Bank failed to include in the record on appeal a copy of its memorandum of points and authorities upon which it relies.  As the appellant, U.S. Bank had the burden of producing an adequate record to consider the issues on appeal. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.)  As the respondent to the cross-appeal, U.S. Bank also had the prerogative to add missing records supporting its position in its brief.  (See *Tagney v. Hoy* (1968) 260 Cal.App.2d 372, 377.)  We thus find no basis for considering whether to remand the matter to the trial court.

10.    On page 37, add the following paragraphs after the first FULL paragraph before heading 1:

In its petition for rehearing, U.S. Bank states the opinion "appears to suggest that because of the manner in which [U.S. Bank] organized its briefing of the punitive-liability issue, it has either (1) forfeited its right to challenge punitive liability for wrongful termination; or (2) forfeited its right to have the Court separately analyze punitive liability for wrongful termination and defamation."  U.S. Bank asserts "neither holding would be justified" because "King argued a single course of conduct supported both claims," citing King's respondent's brief and Civil Code section 3294 "as applied to a corporate employer requires examination of the mental state and duties of the person asserted to be 'an officer, director, or managing director of the corporation,' not the type of tort."  In U.S. Bank's view, King "targeted a single set individuals [*sic*] at [U.S. Bank] with the culpable mental state, without differentiating between conduct relating to defamation and conduct relating to wrongful termination."  U.S. Bank "therefore believed that it could most efficiently address the issue of punitive liability on both claims by analyzing whether each person involved in the so-called 'scheme' was a managing agent and demonstrating that none of them was proven to have engaged in despicable conduct with respect to either defamation or wrongful termination."

6

This appeal does not turn on what King's theory or arguments were at trial or on appeal. The appeal turns on U.S. Bank's assertions of error with respect to the *jury's findings*, if any. With respect to wrongful termination, the jury found U.S. Bank's decision to terminate King was committed with malice, oppression, or fraud, in accordance with Civil Code section 3294, subdivision (a). On appeal, this finding is presumed correct unless U.S. Bank affirmatively demonstrates error. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) If U.S. Bank wished to challenge the sufficiency of the evidence to support this finding, it had to cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. (*Ibid*.) U.S. Bank makes no attempt to do so and thus we surmise it does not challenge the jury's finding.

To illustrate this point, we note that, as to Gerlach and McGovern, U.S. Bank argues neither's conduct was despicable given the *investigation* undertaken, and asserts "upholding the finding of punitive liability here would put employers in a no-win situation" because it "would risk punitive damages for *defamation* if a jury were to decide after the fact that the employer too readily believed the accusers." (Italics added.) In his brief, King argues substantial evidence "shows [McGovern] decided to terminate King," providing citations to the record. King further asserts, "[l]ike any other relevant matter, evidence that U.S. Bank's decision-makers gave false explanations for the termination decision -- which they did as to both (i) in its pretextual grounds and (ii) who made it -- supports a finding that their conduct was willful and in conscious disregard of King's rights." King also asserts there was substantial evidence to support the jury's finding that Gerlach made the decision to terminate King. U.S. Bank fails to address these arguments in its reply brief, and never addresses whether McGovern's or Gerlach's actions in the termination decision could support the jury's finding of malice, oppression, or fraud. If U.S. Bank wished to challenge the jury's finding of malice, oppression, or fraud with regard to wrongful termination, it had the burden of setting forth all of the evidence on

this issue *in support of the jury's finding* and explaining why the finding is unsupported by the evidence.  We thus find no basis for modifying the opinion.

There is no change in the judgment.  The petition for rehearing is denied.

BY THE COURT:


/s/_____
Hull, Acting P. J.


/s/_____
Robie, J.


/s/_____
Butz, J.*

---

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

8

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TIMOTHY KING,<br><br>     Plaintiff and Appellant,<br><br>  v.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>     Defendant and Appellant. | C085276<br><br>(Super. Ct. No.<br>34201300154644CUDFGDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, Christopher E. Krueger, Judge. Affirmed in part and reversed in part.

Christopher H. Whelan, Inc. and Christopher H. Whelan; Whelan Law Group and Brian D. Whelan; Brian D. Coolidge, for Plaintiff and Appellant.

Drinker Biddle & Reath, Cheryl D. Orr, Vernon I. Zvoleff, Ramon A. Miyar and Philippe A. Lebel; Mayer Brown, Donald M. Falk, Evan M. Tager, and Miriam R. Nemetz, for Defendant and Appellant.

A jury returned verdicts in favor of plaintiff Timothy King against defendant U.S. Bank National Association (U.S. Bank) for defamation, wrongful termination in violation

1

of public policy, and breach of the implied covenant of good faith and fair dealing, awarding King almost $24.3 million in compensatory and punitive damages. U.S. Bank filed a motion for judgment notwithstanding the verdict on the ground that there was no substantial evidence to support the jury's verdicts and the award of punitive damages. The trial court denied the motion. U.S. Bank also filed a motion for new trial on the grounds that there was insufficient evidence to support the verdicts, the damages were excessive, and there was an irregularity in the proceedings that prevented a fair trial. The trial court conditionally granted the motion for new trial on the excessive damages ground conditioned upon King agreeing to a remittitur, but denied the motion on the other grounds asserted. King accepted the remittitur and the trial court entered judgment on the remitted award of over $5.4 million.

U.S. Bank appeals, challenging the jury's verdicts on each of the causes of action and the remitted award of punitive damages. King cross-appeals, challenging the trial court's new trial orders on excessive damages.[1] We find no merit in U.S. Bank's challenge to the jury's verdicts in favor of King; we do, however, find merit in some of King's arguments.

We reverse the trial court's new trial orders, but agree with the trial court, following our own independent review, that a one-to-one ratio between compensatory and punitive damages is the constitutional limit under the facts of this case. We remand with directions to modify the judgment accordingly. As a result, King is awarded

---

[1]    Ordinarily, when a plaintiff consents to a remittitur, he or she waives the right to an appeal on any inseverable issue. However, if the defendant appeals, the plaintiff may cross-appeal because the defendant's appeal deprives the plaintiff of the benefits of consenting to the remittitur. (*Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 343-345.) That is what occurred here.

$8,689,696 in compensatory damages and $8,489,696[2] in punitive damages, for a total of $17,179,392.

## FACTUAL AND PROCEDURAL BACKGROUND

For the reader's ease, we discuss the pertinent facts relating to the trial here and the facts relating to the new trial motion in the discussion section pertaining to that issue. "In summarizing the facts, we view the evidence in favor of the judgment." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693-694 (*Roby*).)

### I

### *General Background*

King started in the position of senior vice president regional manager, market lead, and market president for U.S. Bank's Sacramento area in January 2007. He managed the commercial banking business for the region. The commercial banking division worked with companies whose revenues were between $25.1 million and $750 million.

In the summer of 2007, King got involved in the "building deeper relationships" initiative (the initiative) to drive increased revenue; he was one of the core members of the initiative. King later trained employees on the initiative, including how to track the requirements in the tracking system called Siebel. He received strong annual performance reviews from 2007 through 2011. King substantially exceeded the majority of his financial goals in 2010 and 2011.

In November 2012,[3] four people reported to King -- Kim Thakur, John Flinn, Edgar Gill, and Caroline Kim -- and King reported to Michael Walker, who reported to Kenneth Ladd. Thakur, Flinn, and Gill were relationship managers and Kim was King's

---

[2]     As we explain *post*, the $200,000 awarded for the breach of the implied covenant claim cannot form the basis for the punitive damages award because the jury did not make a finding that U.S. Bank's breach was committed with malice, oppression, or fraud.

[3]     All further date references are to 2012 unless otherwise specified.

administrative assistant.  King had performance concerns as to Thakur and Flinn. According to King, Flinn was upset with him about the performance review ratings King gave him in 2012 and because King assigned a deal to Thakur rather than to him.  Thakur had made several mistakes in 2012; King told her to look into a potential position in a different area of the bank because he was imminently intending to place her on a performance improvement plan.  In September, King also rescinded his prior recommendation to have Thakur join a nonprofit board due to his concern that she would not be employed with the bank in the long term.

On November 7, Thakur contacted Maureen McGovern, a human resources generalist for U.S. Bank, raising claims of gender discrimination and harassment against King.  During the investigation of Thakur's claims, Thakur and Flinn made other allegations as well, including that King told them to falsify their expense reports and input meetings required under the initiative into Siebel when the meetings had not occurred.  Based on the findings from McGovern's investigation, U.S. Bank terminated King's employment on December 27.

King sued U.S. Bank for defamation, wrongful termination in violation of public policy (citing Lab. Code, § 200 et seq.), and breach of the implied covenant of good faith and fair dealing.  The jury found in favor of King on all causes of action, submitting its findings to the court on a special verdict form.

As to the defamation cause of action, the jury found one or more U.S. Bank former or current employees had made the following statements in the scope of their employment:  King instructed Thakur and Flinn to falsify reports or records to reflect initiative meetings had taken place when none had actually occurred; King told Thakur to record him present at all initiative meetings even if King did not attend; King instructed others to falsify expense reports; King falsified his vacation records or instructed others to falsify their vacation records; King made inappropriate remarks to and/or about Thakur based on gender or sex; King retaliated against Thakur and/or Flinn after they

4

communicated with U.S. Bank's human resources department; King was a member of the Mafia; and King was stalking Thakur. And, as to "any [such] statement(s)," the statement(s) was a statement of fact and not substantially true, and the person who made the statement(s) reasonably understood the statement(s) was about King, did not use reasonable care to determine the truth or falsity of the statement(s), and made the statement(s) with hatred or ill will toward King or without reasonable grounds for believing the truth of the statement(s). The jury awarded King $6 million in damages, consisting of $1 million for harm to his property, business, trade, profession, or occupation, $4 million for harm to his reputation, and $1 million for shame, mortification, or hurt feelings.

As to the wrongful termination cause of action, the jury found, among other things, that, as of the date of his termination, King had earned a bonus pursuant to a document titled the 2012 "Relationship Management Plan" (2012 Plan) and U.S. Bank's desire to deprive King of that bonus was a substantial motivating reason for the decision to terminate his employment. The jury awarded King $2,489,696 in damages, consisting of $1,035,430 for past lost earnings and $1,454,266 for future lost earnings.

As to the breach of the implied covenant of good faith and fair dealing cause of action, the jury found King and U.S. Bank entered into a contract for a bonus in 2012, King performed all or substantially all of the significant requirements of the contract, all conditions required for U.S. Bank's performance occurred, U.S. Bank unfairly interfered with King's right to receive the benefits of the contract (i.e., a 2012 bonus), and King was harmed by U.S. Bank's conduct. The jury awarded King $200,000 in past economic damages as the value of his 2012 bonus.

As to the request for punitive damages, the jury found: (1) the defamatory statements were made with malice, oppression, or fraud and were made by an officer, director, or managing agent of U.S. Bank or ratified or approved by an officer, director, or managing agent of U.S. Bank; and (2) the decision to terminate King was committed

5

with malice, oppression, or fraud, and made by one or more officers, directors, or managing agents of U.S. Bank. The jury awarded King $15.6 million in punitive damages.

II

*Pertinent Trial Testimony*

There were many witnesses at trial. We set forth only the trial testimony pertinent to the issues before us on appeal given the standard of review.

A

*Human Resources*

1

*McGovern*

In 2012, McGovern was the human resources generalist for U.S. Bank covering the commercial banking divisions throughout the United States. She reported to Kelly Gerlach, who reported to Arno Ellis, who reported to Brian Bebel. When McGovern conducted the investigation into Thakur's claims, there were no rules, policy, procedure, practice or criteria to determine whether to allow an employee to respond to accusations against him or her. McGovern also had never prepared a written investigation plan, attended any training, or read any materials on how to conduct an investigation prior to the King investigation. She had to consult with a supervisor on how to conduct an investigation on a case-by-case basis, depending on the circumstances. It was up to McGovern to decide the issues she would take to her supervisor.

McGovern explained U.S. Bank had a policy of providing fair, thorough investigations into employment matters. Part of such an investigation was to determine the truthfulness of the allegations, to find the relevant facts, witnesses, and documents, to look for information that supported or contradicted the allegations, and to interview key witnesses. McGovern knew part of her job as an investigator was to determine the witnesses' veracity and that an employee facing discipline or a negative performance

6

action might have a motive to lie. She also knew an employee might lie for financial gain. The bank's code of ethics policy provided, among other things: "Making false allegations due to improper motives is a serious issue and may result in disciplinary action. Such allegations undermine the effectiveness of the reporting process, compromise the reputation of others, and will not be tolerated."

McGovern testified King was terminated for instructing two of his employees to input false information into Siebel, poor communication, poor management or leadership, and for telling employees to falsify expenses or that it was appropriate to get paid out for vacation.[4] Although Thakur told her that she (Thakur) had heard someone in King's family was in the Mafia or "mob,"[5] McGovern did not take the comment into consideration during the investigation because she did not believe it.

Thakur told McGovern that King gave her a document and instructed her to input the initiative meeting information into Siebel, to enter the meetings on different dates picked at random, and to indicate King was present at the meetings. Thakur did not believe such meetings had occurred; in her view, no one was doing initiative meetings. Thakur entered the information as King requested because she was afraid of losing her job. McGovern said Flinn told her that, before Thakur was hired, King would give him a list or report of initiative meetings and tell him to input them into Siebel. Flinn had not attended those meetings but Flinn did not know if King had attended them.

---

[4] McGovern did not identify the gender discrimination and harassment allegations as a basis for terminating King. Thakur did, however, make specific accusations that King, among other things, told her to use her looks and that she "was hired for the whole package; looks, skills, and pedigree."

[5] King attempted to use portions of Thakur's deposition to refresh McGovern's memory as to Thakur's comment on the subject. In her deposition, Thakur said she heard King was in the Mafia and relayed the comment to McGovern.

7

To evaluate the veracity of Thakur's accusation, part of McGovern's investigation comprised of determining whether initiative meetings had occurred. McGovern, however, confirmed that, at the time of her deposition, she still did not have an understanding of what internal and external initiative meetings were and she never contacted anyone during the investigation to help her understand the definition of an initiative meeting.

McGovern testified she spoke to "multiple people in the office who said that [initiative] meetings were not happening." When asked later in her testimony whether she relied solely on Thakur's allegations, McGovern replied she also relied on "other people in the Sacramento office [and Peter] Hom, who said that they weren't aware of [initiative] meetings happening or that they weren't happening." The "other people" were Jennifer Neal and Oksana Guy. Neal and Guy were portfolio managers who did not need to be included in initiative meetings; in other words, such meetings could occur without them. Hom was located in San Francisco; McGovern took no steps to determine whether he had to be involved in initiative meetings and she understood initiative meetings could occur in Sacramento without his participation.

McGovern also learned, however, that Gill and Flinn had had initiative meetings in 2012. Although she agreed "[y]ou would want to look into inconsistencies or reconcile them" before coming to a conclusion in an investigation, she did not think the information that initiative meetings had occurred raised an issue as to Thakur's perception or truthfulness. She did not circle back with Thakur to discuss Gill's and Flinn's contradiction of her belief that initiative meetings were not occurring.

McGovern acknowledged initiative meetings could be done over the phone, outside the office, and with many or only a couple of people. Indeed, it was not necessary to have more than one person at an initiative meeting. Although it was preferable to include product partners at such meetings, it was not required. Product partners could participate telephonically on a call and could be based across the country,

8

such as in Minnesota or San Francisco. A meeting also did not have to be of a specific duration to qualify as an initiative meeting.

McGovern found Thakur had inputted 20 fraudulent entries into Siebel based on a report she reviewed. McGovern said that, when she looked at the report, she saw Thakur had entered groups of meetings on July 23 and April 11. This, in McGovern's mind, supported Thakur's allegation "that [King] would give her a report and tell her to put them in and pick dates at random." McGovern acknowledged, however, that the same report reflected Flinn had entered a bunch of meetings on July 23 as well. When she asked Flinn about those entries, Flinn confirmed those meetings had actually occurred. McGovern also acknowledged there were no specific time frames within which initiative meetings had to be entered into Siebel; the meetings could be entered into the system weeks or months later.

On the expense issue, Thakur told McGovern that King had told her to pad the mileage on her report to cover unreimbursed parking and Flinn had told her (Thakur) that King had said the same thing to him. Flinn told McGovern that King said to put a meal on his corporate card and reference a client on his expense report who was not present. McGovern did not ask Flinn about the statement Thakur attributed to him and she did not ask Thakur if she (Thakur) had ever bluffed her expense report as suggested by King. McGovern acknowledged it was a bank policy to look into potential dishonesty but McGovern chose not to ask Thakur about the potential dishonesty in this instance. Gerlach knew about Thakur's allegation and Gerlach did not instruct McGovern to ask Thakur whether she padded her expenses.

As to the vacation allegation, McGovern testified Thakur said Gill told her King had told him that King took vacation, did not record it, and got paid out for it at the end of the year. Gill later told McGovern he never said that. McGovern also testified Flinn told her King had said he (King) got paid for vacation and "it's a nice check." In her deposition, McGovern said she took this statement by Flinn " 'to mean that Mr. King did

9

not report vacation in order . . . to get paid out for it' " but acknowledged she had no evidence King was taking vacation and not reporting it. No one said King told them to take vacation and not report it. McGovern explained it was company policy for employees to take vacation in the year it was earned but, if an employee had unused vacation at the end of the year, it was paid out as required under California law. It was not wrong or contrary to the bank's policy for an employee to be paid out his or her unused vacation.

McGovern did not seek any information from King to contradict any of the allegations because she believed they "had gathered sufficient information to make a decision with regard to his employment." She was aware Walker had asked King whether the initiative reports were accurate and King had said, yes. McGovern explained the accused gets the opportunity to address accusations on a case-by-case basis. She did not know if King had any facts, documents, or witnesses to refute the allegations, and she did not care if he had any such contradictory evidence. Gerlach knew McGovern had not spoken with King or asked him to identify any facts, documents, or witnesses contradicting the allegations. Gerlach never criticized McGovern for failing to obtain such information and never asked her to provide King's side of the story.

McGovern also took no steps to determine whether Thakur or Flinn had any motive to lie. She made no such inquiry because she "didn't have an indication that they had made false allegations." Although the bank's code of ethics provided that an employee could not justify illegal or unethical acts by saying someone in the organization, even a higher authority, directed him or her to do so, McGovern did not believe that making fraudulent documents, as Thakur had, necessarily hurt her credibility.

McGovern knew, however, from a conversation with Walker, that Thakur and King were having communication problems and King had not been pleased with Thakur's performance for three to six months prior to the complaint. Walker gave McGovern specific examples of mistakes Thakur had made and said Thakur had not used

10

her best judgment with clients, perhaps due to her inexperience. McGovern also knew Thakur was concerned about King squeezing her out of a deal and Flinn was upset with the performance review he had received from King. Flinn told McGovern that if King left, there would be "pent up business that could come forward." Additionally, during her investigation, McGovern learned that at least one of Thakur's allegations was refuted -- when Gill said he never told Thakur that King had told him he (King) took vacation but did not record it and got paid out for it instead. McGovern was not concerned about Gill's contradiction of Thakur's allegation and never circled back with Thakur regarding the inconsistency.

McGovern relayed the findings of her investigation to Gerlach and Walker on December 19. She told them King "had instructed two members of his staff to put false information regarding [initiative] meetings into the tracking system," made inappropriate references to Thakur being eye candy, and said a client liked "hot Asian chicks." She further raised concerns about the lack of meetings with partners, King making remarks about other bank employees, and issues relating to vacation and parking. The court admitted as an exhibit notes typed by McGovern in preparation for her discussion with Walker. McGovern testified the typed notes reflected what she told Walker. In those notes, McGovern wrote: "There were some other concerns that were brought up, which we have not been able to confirm but we wanted to share with you. A couple of people said they heard second hand [*sic*] that [King] deliberately doesn't report vacation so it will be paid out to him. We also heard, directly from one person, and second hand [*sic*] from another, that [King] has told people to pad their expense reports to offset their parking cost."

McGovern did not ask Walker to speak to anyone or gather any documents. She also did not ask him about his initiative report reviews over the years, whether there were indications initiative meetings were not happening, or whether he had had any such meetings with King or the relationship managers. McGovern acknowledged that asking

11

Walker such questions was one way of getting more information on the topic. McGovern further could not recall if she questioned Walker about King's managerial style, abilities, competency, or performance.

McGovern denied making the decision to terminate King, explaining the termination decision was made by the business line -- i.e., Walker and Ladd -- "in consultation with human resources." McGovern said Walker made the decision to terminate King based on the findings of her investigation. However, McGovern, Gerlach, Ellis, Walker, and Ladd participated in and approved, or otherwise consulted in connection with, the decision to terminate him. McGovern believed Gerlach spoke with Ellis and Walker spoke with Ladd. McGovern's handwritten notes dated December 21 state: "talked w[ith] Ken yesterday," "he's in agreement behavior can't be tolerated," and "termination." McGovern said those statements were made by Walker.

King read into the record U.S. Bank's original and amended interrogatory responses pertaining to King's termination, verified by McGovern. In the original response, U.S. Bank wrote McGovern and Walker made the decision to terminate King. The response was amended approximately two years later to state Walker, Ladd, McGovern, Gerlach, and Ellis participated in, approved, and/or were otherwise consulted in connection with the decision to terminate him. McGovern said she could not explain why the amendment was made without divulging attorney-client communication.

2

*Gerlach*

In 2012, Gerlach was the vice president and human resources manager for U.S. Bank's wholesale banking division, which included the commercial banking division. She provided guidance to the bank's leaders on U.S. Bank's policies and led two human resources business partners; McGovern was one of them. The bank's general human resources policies were set forth in the code of ethics and the employee handbook.

12

Gerlach participated in the bank's bonus compensation process by looking at the recommendations for bonuses and recommending adjustments up or down as appropriate.

Gerlach learned of Thakur's allegations in November and was involved in the investigation by listening and talking about the information McGovern had collected and providing guidance to McGovern regarding the next steps. Gerlach spoke to Ellis about the investigation four times, providing him with updates. Ellis provided guidance regarding the next steps as well. Gerlach also discussed Thakur's complaint with Bebel and told him "the concern about the [initiative meetings]" and that Walker wanted to terminate King.

When Gerlach discussed the investigation with McGovern and Ellis on November 26, McGovern gave them the following recap of her investigation: Flinn and Thakur had entered initiative meetings into Siebel when they had not been done; Peter Hom (a manager in the San Francisco office) said the initiative meetings were not done; Flinn told her King had told him to input initiative meetings into Siebel when they had not been done; King had gotten paid out for vacation; King had told Flinn to pad his expense report to cover parking; King had told Thakur to cover extra expenses like mileage on her expense report; Flinn and Thakur mentioned King had referred to Thakur as eye candy; and Flinn and Thakur said King had confronted people who talked to Walker about their concerns and things did not get any better. Gerlach said she did not know about an allegation that King or his family was in the Mafia, and she never repeated such an allegation to anyone.

Gerlach reviewed vacation payout records and initiative reports provided by McGovern. McGovern said King got paid out for 64 hours, 76 hours, and 88 hours of vacation over three years. From this, Gerlach concluded King "wasn't tracking the vacation and indeed was getting a check that was nice." She later said she concluded this not just from the report, but also from what others had said. Gerlach acknowledged at trial, however, that they (human resources) should have obtained information from

13

someone with responsibility for recording King's vacation before concluding he "stole vacation time." Gerlach explained King received 160 hours of vacation per year.

After Gerlach reviewed her notes, she said Flinn told McGovern "they don't have to tell King when they take vacation." Gerlach could not recall whether McGovern told her the relationship managers told Kim when they took vacation. She believed it was unethical for King to tell his subordinates that they did not need to tell him when they took vacation.

After speaking with McGovern and Ellis again on November 29, Gerlach and McGovern spoke to Walker on December 6. McGovern relayed to Walker various findings from her investigation. Walker responded he was blown away by some of the information and found it disturbing. He said other findings did not make sense to him and he wanted to do some discovery himself.

Gerlach and McGovern spoke with Walker again on December 12. Walker said the initiative information was false, misleading, and unacceptable, and he wanted to remove King from the position and terminate him. Walker said he was going to ask King questions about the reporting and would do his standard initiative review.

The three had a teleconference again a few days later, on December 19. Gerlach's notes indicate only Walker and McGovern spoke. This time, Walker said he had spoken with King and the reporting was accurate and up to date, according to King. Walker told Gerlach and McGovern he walked away from the conversation with King finding nothing unusual or out of the ordinary. McGovern replied that they were prepared for King to deny it and reiterated King had told employees false information. She told Walker they were "ready to carryout and talk to [Ladd]." Walker agreed "with all points." Gerlach's understanding after that phone call was that Walker was going to talk to Ladd and Walker had decided to terminate King. McGovern later told her that Walker had spoken to Ladd and "we're going to go ahead and terminate him."

14

Gerlach said she and Ellis recommended King's termination, but she did not view her recommendation as approving his termination. She explained it could be confusing as to who made the decision to terminate him. When asked whether she knew if King had any witnesses, facts, or documents to refute the accusations, Gerlach responded she was not in the conversations between King and Walker and King would have had to give such information to Walker.[6] Gerlach believed King had the opportunity to refute the accusations when he spoke with Walker.

Gerlach explained the annual cash bonuses were discretionary and paid out on the last day in February each year. One of the conditions of the bonus was that an employee had to be actively working for the bank on the payment date. A bonus could also be reduced or eliminated if an employee received a written warning or other disciplinary action, was on an action plan, or violated the code of ethics or other policy. The bonus pool was set in mid-December; if an employee left after the bonus pool was set, the employee's allocation would be reallocated to other employees. If King had remained employed with the bank in 2013, Gerlach would have raised the personnel issues during the bonus allocation meeting and would have recommended no bonus be awarded to him.

3

*Bebel*

Bebel was the director of human resources for U.S. Bank in 2012. In 2012, U.S. Bank did not have policies relating to employment investigations, but it did have some verbal guidelines. The investigators were given the discretion and judgment to determine what to do and how to do it, with appropriate support from their managers, like Gerlach.

---

[6]     King read a portion of McGovern's deposition into the record, in which McGovern said she recalled asking Walker to address only two issues with King: the initiative reports and a scorecard issue. Gerlach said she did not know why McGovern would say that.

15

Bebel trusted Gerlach to handle the investigation and did not get involved. The only issue he could recall Gerlach mentioning to him regarding King was "false information being provided in terms of the [initiative]. Cooking the books, so to speak."

Bebel testified human resources generally did not order termination of an employee. He said, however, that, although it "happens very few times a year," human resources may tell a manager his or her employee "has to be terminated." Examples of such instances were theft, embezzlement, or use of a fake identification.

## B

### *King's Supervisors*

### 1

### *Walker*

Walker was the Northern California president, executive vice president, and market president. He made King an offer to join U.S. Bank based on his "reputation that he was a good marketer, an aggressive marketer, very motivated" and "seemed to know people in the Sacramento market." Walker gave King a very favorable review in April for King's performance in 2011. One of his comments was that the "2011 financial results for Sacramento were outstanding and 2012 [wa]s off to a solid start." Walker said he was absolutely happy with King's work in 2011 and believed 2012 was a very successful year financially for the office.

On November 9, McGovern told Walker that King had been asking employees to fraudulently fill out initiative reports. Walker testified he was sure he replied something to the effect that the allegation made no sense. Walker did not think there would be any benefit to King in doing so and testified he was aware King had done initiative meetings. He also told McGovern that King had not been pleased with Thakur's performance for three to six months prior and gave McGovern an example supporting those concerns.

Walker could not recall whether he had a conversation with Thakur later on November 9. He did, however, recall a conversation with her in which she said she was

16

"being stalked" by King. When he "drilled down [on that] a little bit," what Thakur meant was that King was contacting her after hours about a client matter; Walker told Thakur to tell King that she would get back to him during normal business hours.

It was not clear to Walker that McGovern understood "all of the details and the process and the activities around the [initiative] process." When he asked King about the accusation of falsifying initiative reports, King said it did not happen and Walker believed him. Walker could not recall an accusation that King had falsely reported vacation but he did recall McGovern mentioning that Flinn said King had told him to falsely report vacation to get a payout of unused vacation and King had made comments such as "hot Asian chicks" or "hot chicks" in reference to Thakur.

As to Flinn, Walker testified he was aware King was not satisfied with Flinn's performance. Flinn was not performing as anticipated and Flinn had complained to Walker about King's supervision. Walker had concerns about Flinn's veracity or honesty because he "had a lot of bravado" and it was difficult to determine fact from fiction.

Walker met with King on December 27 and informed him that he was being terminated for falsifying initiative reports. Although Walker informed King of the termination, he did not make the decision to terminate him. He also did not know who made the decision, but explained such decisions were generally "a group decision" with Ladd and human resources. Richard Payne, the vice chairman and Ladd's boss, asked Walker about the termination several weeks after it had occurred; Walker told him King was terminated for falsifying initiative information and further information could be obtained through human resources. "That was the extent of [his] knowledge of the termination."

Walker said he was surprised by the termination decision because he had no prior notice regarding the potential for termination or discipline. During a phone call with McGovern, Gerlach, Ladd and possibly Bebel the week before Christmas, Ladd said, "we have to terminate Mr. King." The only accusation Walker recalled being mentioned

17

during that phone call was the initiative reporting issue. Walker called Ladd after that phone call to find out how the termination decision was made. Walker expressed to Ladd his concern about the investigation and the process undertaken by McGovern. Ladd told Walker the decision had been made and something to the effect that the decision had been "fully vetted." Ladd said the termination had to be done by the end of the year; Walker informed him he (Walker) would be on vacation. Ladd responded that, if Walker was not going to terminate King, someone else would.

Walker criticized the bank's investigation of the allegations against King and the process pertaining to King's termination. As to the investigation, Walker explained that he had previously seen "good process" at the bank in terms of employment investigations and, in his experience, an employee would normally be given an opportunity to refute accusations raising the risk of termination. He assumed it was part of a fair and thorough investigation. The process pertaining to King's termination was also, in Walker's view, different from the bank's typical protocols and procedures. Walker had previously participated in the terminations of other employees; he explained that employees would generally receive a verbal warning and then a written warning to be "managed out" and he, as the direct supervisor, would normally be a part of the decision-making process. In a serious employee matter, he would normally participate in the process with Ladd, human resources, and others. That is not what occurred with King. Walker told Ladd he did not know what the process was with respect to King's termination other than a couple of conversations he had had with McGovern. Walker said he had seen no evidence justifying King's termination.

Walker testified King would have gotten a bonus of approximately $260,000 for his work in 2012, if he had not been terminated. The 2012 Plan was the cash bonus plan.

In 2013, when Walker sat next to Gerlach at a dinner in Minnesota, Gerlach said somebody made the accusation that King was in the Mafia. Walker viewed the comment as naive.

## 2

### *Ladd*

In 2012, Ladd was the executive vice president, head of commercial banking at U.S. Bank, overseeing 32 markets in 24 states and approximately 600 employees. Ladd denied telling Walker to terminate King by the end of the year or that the decision was "fully vetted." He described the decision to terminate King in two ways. First, Ladd said Walker informed him of the decision to terminate King, and Ladd agreed with the decision. Second, Ladd explained Walker recommended that King be terminated and he (Ladd) agreed with that decision. He said, "if that's approval, then I accept that I approved that."

Ladd said he agreed with the termination decision because it was the recommendation of human resources and he was not satisfied with King's performance. Prior to December, Ladd had three concerns with King's performance: (1) an unusually high turnover rate within the relationship manager ranks; (2) concerns regarding his ability to effectively lead as a sales leader and to lead relationship managers to achieve goals and objectives; and (3) concerns about the general financial performance of the team. As to the turnover rate, Ladd said he became aware of the high turnover in the "2008 to 2009 time frame." When asked whether he recalled anyone leaving in 2011 or 2012, Ladd said he did, but was unable to identify a specific employee. As to financial performance, Ladd testified the Sacramento region "as a whole struggled meeting its financial objectives or its budget" in 2011 and 2012.

Ladd first spoke to human resources -- McGovern and Gerlach -- about the investigation and then had a one-on-one conversation with Walker. Ladd understood McGovern was a "senior partner in [human resources]." Human resources advised Ladd a complaint had been filed, they had done "extensive and detailed research," and they had made a recommendation to terminate King. Human resources did not provide him with any specific findings or details about the complaint but assured him the complaint was

valid. Ladd knew, however, that one of the accusations was that King had instructed staff to falsify initiative reports.

Ladd did not know King had never been interviewed or been given an opportunity to present facts, documents, or witnesses to refute the accusations. He said he would have expected human resources to have interviewed King before making a recommendation to terminate him.

C

*Other Witnesses In The Investigation*

1

*Thakur*

By September, Thakur knew King was upset with her. She reported her concerns about King to human resources after taking the sexual harassment training and speaking with Hom about her concerns; Hom encouraged her to speak to human resources.

Thakur reiterated the allegations she raised in her complaint to human resources regarding, among other things, the initiative and expense reports, vacation reporting, sexual comments, and gender discrimination. She told McGovern there were rumors King was in the Mafia[7]; Thakur had heard the comment from some unknown group standing outside her office. She told McGovern King was retaliating against her as a result of her complaint to human resources. Thakur also told McGovern she feared King might harm her or her family, that he was stalking her, and she was pregnant and worried about losing her baby because she had had a miscarriage earlier in the year. McGovern never circled back with Thakur to discuss the results of her investigation.

---

[7]     Thakur first testified she told McGovern there were rumors that King's dad was in the Mafia. After impeaching her with her deposition testimony, Thakur confirmed she told McGovern she heard King was in the Mafia.

Thakur further testified to other issues she had with King that she did not mention to human resources, including a gender bias/discrimination comment King allegedly made to her on the first day she met him. Thakur also said she did not initially accept King's employment offer because he had a reputation of being "a psychopath" and her coworkers discouraged her from taking the position.

## 2

### *Flinn*

Flinn's deposition testimony was presented to the jury. Flinn said he did not know anything about King falsifying vacation or expenses and was not aware of King telling anyone to falsify parking or vacation. King never told him to pad his expenses. Flinn felt King was sabotaging his performance and that King did not want him to be successful. King "made [his] world a nightmare." McGovern did not ask Flinn for any documents; rather, she called him. Flinn confirmed King asked him to enter initiative meetings into Siebel that had not occurred, and that King had referred to Thakur as eye candy or something to that effect.

## 3

### *Gill*

Gill told McGovern he (Gill) had initiative meetings with King in 2012. Gill had heard allegations from Flinn and Thakur regarding King taking vacation, not recording it, and being paid out. Flinn told him something regarding padding his mileage to cover his parking expenses and that King had said Thakur was eye candy for customers and to take vacation, not report it, and get paid out at the end of the year. Gill explained Flinn was frustrated that King had allocated a deal to Thakur rather than to Flinn. When asked what is "the importance of a banker's reputation to him or her?," Gill responded: "I think it's everything. It's -- it gets to the client or prospect before you do in terms of your reputation. You know, when it's good, I think it benefits you greatly."

21

## 4

### *Neal*

Neal was a portfolio manager in commercial banking at U.S. Bank. She sat next to Thakur. Portfolio managers focused on the credit side of the relationship with the client, while the relationship managers were the "go-to person" for the client.

Neal testified she initially got along with King but was not getting along with him in 2012. She overheard King calling her a "nitwit" to another employee.

When Neal spoke with McGovern in November, McGovern wanted to hear about workplace rumors regarding padded expense reports, vacation, and the tone of the office. In her deposition, Neal said she told McGovern that Gill said King had told him to take vacation and not report it. Neal also told McGovern there were rumors about expense padding. McGovern did not ask for any documentation to support the rumors, and Neal provided none. McGovern further asked Neal to describe initiative meetings to her, but Neal did not have an understanding of what an internal or external initiative meeting was.

After King was terminated, Thakur and Flinn told Neal that King had instructed them to falsify records. King at some point told Neal his father either knew people in the "mob," or he was involved in it.

## 5

### *Hom*

Portions of Hom's deposition testimony were read into the record. Hom said the bank did not take termination decisions lightly and, in his experience, "[m]any, many people ha[d] to agree with the assessment" of termination. Hom said Thakur told him King had berated her; Hom told Thakur to talk to King or, alternatively, to talk to Walker if she felt it was necessary. Hom told King that Thakur was upset. After King "basically outlined the issues to [him]," Hom felt Thakur was in the wrong. He did not recall Thakur telling him anything about King telling her to falsify documents.

# D

## *King*

King testified the Sacramento region was first in terms of the percentage of growth over budget in U.S. Bank in 2011. It was also first in revenues compared to the other regions in the country. King believed Walker was satisfied with his performance.

King detailed the specific issues he had with Thakur's performance and identified several mistakes she had made in 2012. He explained how the initiative process worked and defined what internal and external initiative meetings were. King testified that, if he were given an opportunity to respond to the accusation that he never did any initiative meetings during Thakur's tenure, he would have refuted the accusation by pulling the initiative relationship review detail report and his e-mails and calendar, and offering to call clients. King made a list of 53 internal and external initiative meetings he conducted in 2012 based on e-mails he had in his possession. He estimated he did hundreds of internal and external initiative meetings in 2011 and 2012.

King denied telling Flinn or Thakur to falsify the initiative reports; he asked them to input initiative meetings that had occurred. He also denied treating Thakur differently based on her gender and making the sexist statements attributed to him by others. He further denied the allegations pertaining to the vacation reporting and expense reports. King said he was never a member of the Mafia nor was his father. He did, however, tell Neal at some point that a couple of his grandfather's children were involved in the "mob," and several of their siblings decided to change their names as a result.

King told Walker he wanted to talk to human resources after he learned Thakur had lodged a complaint, but Walker said there was no reason for him to do so and he (Walker) was not worried about it. King confirmed the accuracy of the initiative reports with Walker on December 13.

King was on vacation the week of December 24. Walker called and asked King to meet at the office to "go through some bonus stuff." When King met with Walker,

however, Walker said he had to terminate King. Walker was emotional about it and said he had nothing to do with it, he did not support the decision, he did not know what was going on, and he was told it was something he had to do or the head of human resources would fly out and do it. King was crushed by the news.

When he was terminated, King had earned a bonus for 2012 that was going to be paid out in 2013. The Sacramento office had met its targets several months prior to the end of the year.

King looked for a similar position and ultimately accepted a position five months later with another bank. In the new position, King earned substantially less than what he was earning at U.S. Bank. King also lost stock options and had to liquidate his retirement account with associated penalties due to the termination. King's family had to move from a 3,000 square-foot house into a 900 square-foot apartment and had to forego vacations. King also was unable to send his daughter to college as a result of the change in his finances.

When asked what he lost as a result of the termination, King said he lost his career path, confidence, credibility, and pride, and his family and peers lost trust in him. He feared what people were thinking about him and felt like a failure. His reputation was "blown up, annihilated, left with nothing" as a "result of being falsely terminated, accused of being a criminal, accused of stalking, accused of being sexist, accused of being abusive to subordinates." King explained a banker's reputation is everything and his reputation would never be the same; he would not be able to regain it. He explained that being accused of being in the Mafia and falsifying documents were criminal acts leading to blackballing in the banking business.

## E

### *Marlene Murphy*

Murphy used to work at U.S. Bank as a senior vice president and head of middle market banking and administration. Her office was located in Southern California. At the time of trial, Murphy was working at Wells Fargo.

Murphy worked with King for several years prior to his termination. King had a reputation for "being a hard worker, a go-getter, aggressive as it related to business, and a strong advocate for his customers balanced by the needs and requirements of the [b]ank." After his termination, Murphy heard rumors he was terminated for an ethical issue.

Murphy testified she felt Flinn had credibility issues. She had asked King not to allow Flinn to contact her directly because of his credibility issues.

## DISCUSSION

### I

### *U.S. Bank's Challenges To The Jury Verdicts*

"On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.] If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) It is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The testimony of a single person is substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

" 'The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.] While substantial

25

evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding.' " (*Graciano v. Mercury General Corp.* (2014) 231 Cal.App.4th 414, 427.)

A

*The Defamation Verdict Was Supported By Substantial Evidence*

U.S. Bank explains King's defamation cause of action was based on the false statements made by subordinates to human resources and human resources' subsequent republication of those false accusations of misconduct to other employees. The bank does not challenge the jury's findings that defamatory statements were made.[8] It instead asserts: (1) the defamatory statements made by McGovern and/or Gerlach were privileged under Civil Code section 47 because there was no evidence that they republished the false accusations of misconduct with malice; and (2) the bank cannot be held liable for the defamatory statements made by Thakur and/or Flinn because "the intent of a low-level employee who complains about the workplace behavior of another employee cannot be imputed to the employer" and "even if that were not so, King failed to adduce sufficient evidence that [their] statements were made maliciously." We conclude there was substantial evidence McGovern republished the defamatory statements with malice, supporting the defamation verdict. We accordingly do not address the bank's other arguments.

---

[8]    In its opening brief, under the heading that there was no substantial evidence Thakur's and/or Flinn's statements were uttered with malice, U.S. Bank appears to weave in arguments that some of the statements were true or expressions of opinion. We do not consider these contentions. (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].)

26

"At common law, one who republishes a defamatory statement is deemed thereby to have adopted it and so may be held liable, together with the person who originated the statement, for resulting injury to the reputation of the defamation victim. [Citation.] California has adopted the common law in this regard [citations], although by statute the republication of defamatory statements is privileged in certain defined situations (see, e.g., Civ. Code, § 47)." (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 268.)

Under Civil Code section 47, an employer's republication of defamatory statements is generally privileged "because an employer and its employees have a common interest in protecting the workplace from abuse." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 440.) " 'Clearly, an employer is privileged in pursuing its own economic interests and that of its employees to ascertain whether an employee has breached his responsibilities of employment and if so, to communicate, in good faith, that fact to others within its employ so that (1) appropriate action may be taken against the employee; (2) the danger of such breaches occurring in the future may be minimized; and (3) present employees may not develop misconceptions that affect their employment with respect to certain conduct that was undertaken in the past.' " (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538.)

The privilege applies only if the communication was made without malice. (Civ. Code, § 47, subd. (c).) Actual malice is established by a showing that the publication was motivated by hatred or ill will toward the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and acted in reckless disregard of the plaintiff's rights. (*Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1370; cf. *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931 ["negligence is not malice"].) A showing of malice may be based on direct or circumstantial evidence. "A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice. [Citation.] 'A failure to investigate [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known

27

to be unreliable [citations], or known to be biased against the plaintiff [citations] -- such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' " (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84-85.)  An inference of malice may be drawn " 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his [or her] reports.' " (*Id*. at p. 85.)

"The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy." (*Reader's Digest Assn., Inc. v. Superior Court* (1984) 37 Cal.3d 244, 258.) The purposeful avoidance of the truth is, however, another matter.  " '[I]naction,' i.e., failure to investigate, which 'was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges' will support a finding of actual malice." (*Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1048.)

The bank argues McGovern's failure to interview King is not evidence of malice that deprives it of the common-interest privilege; it relies on three cases that purportedly "confirm[] that employers do not lose their right to invoke the common-interest privilege when their employees repeat or act on accusations of misconduct without first gathering all possible evidence or speaking with the accused person." (Citing *McGrory v. Applied Signal Technology, Inc.*, *supra*, 212 Cal.App.4th 1510; *Vackar v. Package Mach. Co.* (N.D.Cal. 1993) 841 F.Supp. 310; *Bierbower v. FHP, Inc.* (1999) 70 Cal.App.4th 1.) Each of those cases turned on the unique facts of that case.  We accordingly do not find any of the cases relied upon analogous or instructive.  We look at the evidence before *this* jury to determine whether there was substantial evidence to support the verdict.  (*People v. Thomas* (1992) 2 Cal.4th 489, 516 ["When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts"].)

The evidence before the jury supported a finding of actual malice based on McGovern's failure to investigate and her reliance on sources known to be unreliable or biased against King.

The jury heard evidence McGovern: (1) knew Thakur had performance issues and was concerned King was squeezing her out of a deal; (2) knew Flinn was upset with King regarding the performance review he had received and indicated he could get additional business if King left; and (3) took no action to look into Thakur's or Flinn's possible motives to lie even though McGovern knew she had a duty to determine witnesses' veracity and that an employee facing discipline or a negative performance action, or one with a financial incentive may have a motive to lie. Thus there was substantial evidence from which the jury could have found Thakur and Flinn were biased and hostile toward King and thus there were " 'obvious reasons to doubt the veracity of the informant[s] or the accuracy of his [and her] reports.' "[9] (*Christian Research Institute v. Alnor*, *supra*, 148 Cal.App.4th at p. 85.) Moreover, McGovern knew that some of Thakur's accusations were contradicted by others -- Gill denied the statement regarding King falsifying his vacation records and Gill and Flinn said initiative meetings were occurring in 2012. From this evidence, the jury could conclude McGovern knew Thakur was an unreliable source.

There was, moreover, substantial evidence McGovern made a deliberate decision not to investigate facts that could have confirmed the falsity of the allegations, supporting a finding of malice. (*Christian Research Institute v. Alnor*, *supra*, 148 Cal.App.4th at pp. 84-85; *Antonovich v. Superior Court*, *supra*, 234 Cal.App.3d at p. 1048.) She knew Thakur's assertion that no initiative meetings were held was contradicted by Gill and Flinn. The interviews with Neal, Guy, and Hom did not assist in resolving the

---

**9** We note the jury further had the opportunity to observe Thakur's testimony at trial and to evaluate her credibility.

contradiction because they did not need to be included in such meetings and would not necessarily have known if such meetings had occurred. McGovern also knew that, based on her discussion with Flinn, the entry of multiple meetings into Siebel on a single day did not necessarily mean the meetings were falsified. And, Walker told her King said the reports were accurate. Despite the foregoing, McGovern made a deliberate decision not to seek any information from King to contradict the allegation that he instructed Thakur to falsify the initiative reports; McGovern said she did not care if he had information to refute the allegation. As to Flinn's allegation that King told him to enter false initiative meetings into Siebel, Flinn told McGovern he (Flinn) did not participate in those meetings but Flinn did not know if King had. King could have provided McGovern with information to determine the veracity of Flinn's allegation as well.

As another example, McGovern's investigation into the vacation allegation also demonstrates a deliberate failure to investigate. McGovern told Walker that "[a] couple of people said they heard second hand [*sic*] that [King] deliberately doesn't report vacation so it will be paid out to him." McGovern relied on Thakur's statement that Gill told her (Thakur) King had told him that King took vacation, did not record it, and got paid out for it at the end of the year. But Gill refuted the allegation and McGovern admitted in her deposition that she saw no evidence King was taking vacation and not reporting it. Although the vacation records showed King was paid out some hours in 2010, 2011, and 2012, it also showed he took a substantial portion of his 160 hours of vacation in each of those years.

The record contains substantial evidence showing McGovern lacked reasonable grounds to believe the truth of at least the following defamatory statements the jury found true: King instructed Thakur and Flinn to falsify reports or records to reflect initiative meetings had taken place when none had actually occurred and King falsified his vacation records or instructed others to falsify their vacation records. There was further substantial evidence she acted in reckless disregard of King's rights when she republished

30

them.  Thus, the jury's actual malice finding is supported by substantial evidence.  (*Noel v. River Hills Wilsons, Inc.*, *supra*, 113 Cal.App.4th at p. 1370.)  We do not consider the parties' remaining arguments on this issue.

B

*The Wrongful Termination Verdict Was Supported By Substantial Evidence*

U.S. Bank asserts the jury's substantial motivating reason finding is not supported by substantial evidence -- i.e., that U.S. Bank's desire to deprive King of the bonus he had earned was a substantial motivating reason for the decision to terminate his employment.  Specifically, U.S. Bank argues King introduced no evidence the investigation was undertaken as a pretext to find an excuse to fire him or that someone wanted to avoid paying him a bonus.  U.S. Bank believes the undisputed facts negate the substantial motivating reason finding because:  (1) the termination was the result of the investigation started by Thakur's complaint to human resources; (2) the bank had no monetary incentive to deny King a bonus because the bonus pool was fixed; (3) all bonus awards were discretionary; and (4) the end of the year had no significance for bonus eligibility.  The bank asserts the only evidence tending to show the decision was motivated by the bonus was Walker's testimony that Ladd instructed him to complete the termination by the end of the year.  That testimony, it maintains, does not give rise to a credible inference that King's termination was motivated by the desire to deprive him of his bonus.  In its reply brief, U.S. Bank asserts there could have been many other reasons to terminate King by year end.

King responds the jury could have reasonably inferred one of the reasons for the termination was to deprive King of his bonus because "U.S. Bank deemed it imperative to terminate King before the end of 2012," Gerlach was on the bonus committee and testified she would have recommended no bonus for King, the confusion as to who made the termination decision and why could have led the jury to infer deception on the part of

31

U.S. Bank, and the 2012 Plan stated the bonus pool was set based upon actual results achieved for the entire 2012 calendar year.

A substantial motivating reason " 'is a reason that actually contributed to the [adverse employment action]. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the [adverse employment action].' " (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 479, fn. 2 [quoting CACI No. 2507].) The substantial motivating factor requirement "ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232.)

The question is not whether there was substantial evidence U.S. Bank terminated King solely because it wanted to deprive him of the bonus; the question is whether there was substantial evidence to find it was a reason that actually contributed to the termination. There was such evidence.

Walker testified King would likely have received a cash bonus in the range of $260,000, if he had not been terminated. The 2012 Plan was an annual cash bonus plan based on an employee's performance and achievement of assigned goals and objectives for the 2012 calendar year. The jury heard evidence tending to show U.S. Bank rushed King's termination to ensure it was completed before year's end. Indeed, Walker testified Ladd said King had to be terminated before the end of the year. The timing of King's termination was purportedly important because Ladd said someone else would do it if Walker did not. Ladd did not care that Walker was going to be on vacation.

There was also evidence U.S. Bank did not follow its normal termination protocols. Walker testified he would normally have been involved in the decision-making process and employees were generally given verbal and/or written warnings prior to termination. This did not occur with respect to King. King also was not given an opportunity to address the accusations but Walker testified an employee would generally

32

be given an opportunity to do so when termination decisions were involved and Ladd said he expected human resources to have interviewed King as part of the investigation. And, as explained in greater detail *ante*, there was evidence indicating the investigation was inadequate and the investigator deliberately declined to acquire knowledge of facts that might have confirmed the probable falsity of the accusations against King -- supporting an inference of pretext. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 280 ["An employer's failure to interview witnesses for potentially exculpatory information evidences pretext"].)

Ladd's testimony also provided evidence of pretext. Ladd testified he agreed with the termination in part due to his preexisting concerns with King's performance. His testimony that the Sacramento region "as a whole struggled meeting its financial objectives or its budget" was directly contradicted by King's performance reviews in 2010 and 2011 and Walker's testimony that 2012 was a very successful year financially for the office.

The jury found King had earned a bonus pursuant to the 2012 Plan and U.S. Bank does not challenge that finding on appeal. The jury could have inferred from the evidence regarding the questionable timing of King's termination coupled with the conflicting testimony as to who made the decision to terminate King, the apparent rush to terminate him, and the failure to conduct a thorough and objective investigation that U.S. Bank desired to deprive King of his bonus and it was a reason that actually contributed to the termination.

U.S. Bank's alternative facts were weighed and rejected by the jury. We do not reweigh them on appeal. We conclude there was substantial evidence supporting the jury's wrongful termination verdict.

C

*The Implied Covenant Verdict Was Supported By Substantial Evidence*

The jury found King and U.S. Bank entered into a contract for a bonus in 2012, the conditions were met, and U.S. Bank unfairly interfered with King's right to receive the bonus. U.S. Bank does not challenge any of the jury's specific findings in this regard. It instead argues King "undisputedly became ineligible to receive a bonus when he was terminated in December" and "[t]he implied covenant cannot impose a duty to pay a bonus that contradicts the plan's express terms."

U.S. Bank misses the mark. The implied covenant verdict does not impose a duty to pay a bonus in contravention of the express conditions stated in the bonus plan. The verdict holds U.S. Bank responsible for breaching its implied duty to act in good faith and in accordance with fair dealing by depriving King of the benefits of the contract. Plainly stated, but for U.S. Bank's bad faith act of terminating King *to avoid paying him the bonus*, King would have received it. "[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484.)

That King was an at-will employee is legally insignificant for purposes of evaluating the validity of the verdict under the circumstances presented. U.S. Bank quotes the following sentence from our Supreme Court's decision in *Guz*: "Precisely because employment at will *allows* the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 350.) This analysis, however, pertained to whether an at-will employee could maintain an implied covenant cause of action against an employer based on the assertion that his arbitrary dismissal frustrated his contract for employment at will when the employer failed to follow its termination policies. (*Id*. at pp. 348-349.) That is not the allegation at issue here.

We find the following explanation in *Guz* more pertinent: "[T]he [implied] covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits. Thus, for example, the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned." (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 353, fn. 18.) The jury here found King had earned a bonus pursuant to the 2012 Plan as of the date of his termination. U.S. Bank does not challenge that finding.[10] As we explained *ante*, the jury's finding that U.S. Bank's desire to deprive King of the bonus was a substantial motivating reason for terminating him is supported by substantial evidence. The jury could have reasonably inferred that the human resources investigation was pretextual. An employer's failure to interview witnesses for potentially exculpatory information may evidence pretext. (*Nazir v. United Airlines, Inc.*, *supra*, 178 Cal.App.4th at p. 280.) McGovern did not interview King or ask him for any documents or witnesses that could potentially refute the allegations against him. This is the precise situation our Supreme Court explained could give rise to a violation of the implied covenant.

U.S. Bank also believes *Nein* supports its position; it does not. (*Nein v. HostPro, Inc.* (2009) 174 Cal.App.4th 833.) In *Nein*, the appellate court held a written employment agreement barred an employee from recovering a sales commission after termination and the employer's refusal to pay the commission could not violate the implied covenant. (*Id*. at p. 852.) At oral argument, the employee asserted the employer "terminated him in order to avoid paying his commission and argued this act frustrated

---

[10]    In its reply brief, U.S. Bank for the first time argues King had not earned the bonus at the time of his termination. We do not consider arguments raised for the first time in a reply brief. (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275-276.)

the purpose of the contract." (*Ibid*.)  The appellate court did not consider the argument because it was not addressed in the trial court.  (*Ibid*.)  The implied covenant cause of action here hinges on King's argument that U.S. Bank terminated him to avoid paying him the bonus -- the very assertion not considered in *Nein*.  Cases are not authority for propositions not considered.  (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

We conclude there was substantial evidence supporting the jury's implied covenant verdict.

## D

### *Punitive Liability Was Supported By Substantial Evidence*

Punitive damages may be awarded only where the jury finds oppression, fraud, or malice by clear and convincing evidence.  (Civ. Code, § 3294, subd. (a).)  A corporate employer is not liable for punitive damages based upon the acts of its employees unless the wrongful conduct was committed, authorized, or ratified by a corporate officer, director, or managing agent.  (Civ. Code, § 3294, subd. (b).)

The jury found King met these requirements for the defamation and wrongful termination causes of action.  Specifically, the jury found an employee made defamatory statements with malice, oppression, or fraud, and the employee was an officer, director, or managing agent of U.S. Bank, or an officer, director, or managing agent ratified the conduct in that capacity; and the decision to terminate King was committed with malice, fraud, or oppression and was made by an officer, director, or managing agent of the bank.

U.S. Bank argues the evidence does not support punitive liability.  It argues, first, punitive liability cannot be based on Thakur's and Flinn's conduct because there was no substantial evidence of malice and they were not managing agents; second, punitive liability cannot be based on McGovern's and Gerlach's conduct because their conduct was not despicable and neither was a managing agent; and, third, there was no clear and convincing evidence any other employee could qualify as a managing agent who

36

personally engaged in, authorized, or ratified outrageous conduct giving rise to such liability.

We note U.S. Bank's argument is general and broad -- that the evidence does not support *any* punitive liability -- rather than specific -- i.e., arguing with appropriate headings that the evidence does not support each of the jury's specific punitive liability findings for wrongful termination and defamation. (See *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [failure to raise a point separately or support with argument and authority will result in issue being deemed forfeited].) We thus respond to U.S. Bank's argument and conclude there was substantial evidence supporting punitive liability based on defamation.

1

*Standard Of Review*

We first address the parties' disagreement regarding the standard of review. The parties agree the substantial evidence standard applies but disagree on how the standard should be applied to the requirement that a plaintiff prove oppression, fraud, or malice by clear and convincing evidence. King asserts the same standard of review applies to punitive liability as "other liability determinations"; whereas U.S. Bank asserts the standard of review is whether "the record contains 'substantial evidence to support a determination by clear and convincing evidence.' " Our Supreme Court recently resolved this question.

On appeal, we "must account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard. When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was

37

true.  In conducting [our] review, [we] must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.* (July 27, 2020, S254938) __ Cal.5th __ [p. 28].)

2

*Analysis*

We conclude there was substantial evidence from which the jury could have found McGovern was a managing agent and made the defamatory statements with malice, giving rise to punitive liability.

a

*Substantial Evidence Supports A Finding Of Malice*

U.S. Bank argues McGovern's conduct was at worst negligent or overzealous, neither of which constitutes malice, oppression, or despicable conduct.  We disagree.

Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)  " 'Despicable conduct' " is conduct that is ' "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." '  [Citation.]  Such conduct has been described as having the character of outrage frequently associated with crime.  [Citation.]  'Conscious disregard' means ' "that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences." '  [Citation.]  Put another way, the defendant must 'have *actual knowledge* of the risk of harm it is creating and, in the face of that knowledge, fail to take steps it knows will reduce or eliminate the risk of harm.' "  (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1159.)

38

"Because punitive damages are imposed 'for the sake of example and by way of punishing the defendant' [citation], they are typically awarded for intentional torts such as . . . *defamation . . . .*" (*Lackner v. North* (2006) 135 Cal.App.4th 1188, 1212, italics added.)  As explained *ante*, there was substantial evidence supporting the jury's finding that McGovern made the defamatory statements with actual malice.  We conclude the record as a whole, viewed in the light most favorable to King and giving appropriate deference to the jury, "contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*Conservatorship of O.B.*, *supra*, __ Cal.5th __ [p. 28].)  The jury reasonably could have concluded McGovern had reasons to believe the statements she made regarding her findings were false, she made them anyway, and she knew such statements would unjustly tarnish King's reputation and would cause both emotional and economic hardship given her termination recommendation.  There was substantial evidence from which the jury could find such conduct despicable.  (*George F. Hillenbrand, Inc. v. Insurance Co. of North America* (2002) 104 Cal.App.4th 784, 819 ["[T]he jury is the barometer of despicability"].)

"We assume [McGovern] felt no personal animus toward [King].  But 'intent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he [or she] knows are substantially certain to result from his [or her] conduct." (*Schroeder v. Auto Driveway Co.* (1974) 11 Cal.3d 908, 922 [discussing punitive damages award].)  The jury reasonably could have inferred McGovern made the defamatory statements willfully and intentionally, and, given the severe consequences she knew would flow from those statements, she acted in reckless disregard of King's rights.  Such behavior justifies punitive liability.

U.S. Bank places significant emphasis on *Tomaselli*.  (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269.)  In that case, the Court of Appeal found insufficient evidence for punitive liability based on an insurer's bad faith denial of an insurance claim, which included failing to follow-up on information provided by the

insured, taking an unnecessary deposition of the insured, relying on an endorsement which was not shown to have been delivered, and failing to communicate. (*Id*. at p. 1288.) We do not find the case analogous or on point. That McGovern's "actions could just as easily have been 'the result of a[n] . . . error of judgment, over-zealousness, mere negligence, or other such noniniquitous human failing,' " as U.S. Bank contends, does not change the fact that there was substantial evidence supporting the jury's verdict. (Citing *Tomaselli*, at p. 1288, fn. 14.)

b

*Substantial Evidence Supports A Finding McGovern Was A Managing Agent*

"The term 'managing agent' includes 'only those corporate employees who exercise substantial independent authority and judgment in their corporate decision-making so that their decisions ultimately determine corporate policy.' [Citation.] '[T]o demonstrate that an employee is a true managing agent . . . , a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business.' [Citation.] But the determination of whether certain employees are managing agents ' "does not necessarily hinge on their 'level' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions . . . ." ' " (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 886.) Corporate policy refers to "the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations." (*Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167.)

"The scope of a corporate employee's discretion and authority . . . is . . . a question of fact for decision on a case-by-case basis." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 567.) Here, there was substantial evidence from which the jury could conclude McGovern was a managing agent.

40

In 2012, U.S. Bank's code of ethics provided that "[s]uspected acts of dishonesty, misconduct, or conduct that is inconsistent with these important ethical standards w[ould] be investigated in a fair and thorough manner." The bank did not, however, have any rules, policies, procedures, practices, or criteria in place for investigators to follow in performing such investigations. The investigators, like McGovern, were given the discretion and judgment to determine what to do and how to do it, with appropriate support from their managers. It was up to the investigators, however, to determine if/when to consult with their managers on a case-by-case basis.

McGovern was the human resources generalist overseeing the commercial banking division throughout the United States. The commercial banking division comprised of approximately 600 employees in 32 markets in 24 states. There was no evidence suggesting McGovern's ability to determine who to interview or how to perform an interview or investigation (e.g., whether to obtain written statements) was limited in any respect. Given the breadth of the discretion delegated to her in determining how to fairly and thoroughly investigate suspected acts of dishonesty or unethical misconduct (i.e., a corporate policy) and what constituted a fair and thorough investigation -- the results of which would determine (and in this case did determine) whether an employee would be disciplined or terminated -- the jury could have reasonably inferred she had the authority and discretion to interpret and apply the investigative policies for U.S. Bank's commercial banking division as she saw fit, such that her decisions ultimately determined corporate policy. (See *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 373 [trier of fact could reasonably infer an equal employment opportunity officer "had authority and discretion in making, interpreting, and applying [the corporation's equal employment opportunity] policies on a corporationwide basis and therefore had authority and discretion to make decisions that ultimately determine corporate policy," rendering him a managing agent].)

An employee exercising authority that results in the ad hoc formulation of policy is a managing agent. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 823.) U.S. Bank cannot attempt "to shield itself from liability by the expedient of . . . having a pro forma official policy -- issued by high-level management -- while conferring broad discretion in lower-level employees to implement company policy in a discriminatory or otherwise culpable manner. It is what the company *does* -- including through the discretionary acts of its employees -- not just what it *says* in a stated or written policy, that matters." (*White v. Ultramar*, *supra*, 21 Cal.4th at p. 583 [conc. opn. of Mosk, J.].)

U.S. Bank's attempt to classify McGovern as "an entry-level employee" does not negate the discretion delegated to her. Indeed, Ladd testified he believed McGovern was a "senior partner in [human resources]" based on his interactions with her. Nor is the fact that McGovern did not have the authority to terminate an employee, as U.S. Bank asserts, dispositive in the managing agent inquiry. (See *White v. Ultramar*, *supra*, 21 Cal.4th at p. 574, fn. 4.) McGovern's consultations with Gerlach regarding the investigation also does not change the level of discretion and authority delegated to McGovern in performing the investigation and determining what constituted a fair and thorough investigation. From McGovern's and Gerlach's testimony, the jury could have reasonably gleaned McGovern performed the investigation autonomously and merely relayed her findings to Gerlach; Gerlach, in turn, listened to McGovern's summary of the information obtained from witnesses and documents and then provided McGovern with "guidance on next steps," such as talking to Walker. McGovern's findings from the investigation were shared with higher level employees in the human resources department and other leaders in the organization, and those findings formed the basis for the decision to terminate King.

The inquiry is not whether McGovern was the only managing agent involved in the termination/investigation but whether she was a managing agent in the role she performed for the corporation when she made the defamatory statements. There was

42

substantial evidence from which the jury could have concluded she was.  Thus, because there was substantial evidence that McGovern was a managing agent and personally made the malicious defamatory statements, there was substantial evidence supporting punitive liability.

## II

### *The Parties' Challenges To The New Trial Orders*

U.S. Bank asserts the remitted punitive damages award is unconstitutionally excessive and should be reduced to a nominal amount "because the substantial award of compensatory damages is, by itself, sufficient to punish and deter."  In his cross-appeal, King argues the trial court erred in granting the new trial motion as to each of the damages awards.  We first address King's arguments regarding the new trial orders and then address the constitutionality of the punitive damages award.

### A

### *King's Challenges To The Remitted Compensatory Damages New Trial Orders*

#### 1

### *Standard Of Review*

Given the arguments raised by King, our review of the new trial orders consists of a two-phase inquiry.  We first independently review each order for compliance with Code of Civil Procedure[11] section 657.  (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 628.)  Section 657 provides that, "[w]hen a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated."

The words " 'ground' " and " 'reason' " have different meanings.  (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112.)  "The word 'ground' refers to any of the seven

---

[11]    All further section references are to the Code of Civil Procedure unless otherwise specified.

43

grounds listed in section 657. [Citation.] A statement of grounds that reasonably approximates the statutory language is sufficient. [Citations.] The statement of 'reasons,' on the other hand, should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation." (*Oakland Raiders v. National Football League*, *supra*, 41 Cal.4th at p. 634.) " '[T]he trial judge is not necessarily required to cite page and line of the record, or discuss the testimony of particular witnesses,' nor need he [or she] undertake 'a discussion of the weight to be given, and the inferences to be drawn from each item of evidence supporting, or impeaching, the judgment[,]' " but the "trial judge [is required] to briefly identify the deficiencies he [or she] finds in 'the evidence' or 'the record' or [citation] 'the proof' -- rather than merely in 'the issues' or 'the ultimate facts.' " (*Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 370, 367.)

Where an order is based solely on insufficiency of the evidence or excessive damages and fails to state reasons sufficient under section 657, the judgment is automatically reinstated.[12] (*La Manna v. Stewart* (1975) 13 Cal.3d 413, 425; *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63.) The "appellate court cannot remand the case to permit the trial court to correct an insufficient statement of reasons." (*Oakland Raiders v. National Football League*, *supra*, 41 Cal.4th at p. 635.)

Although "[t]he courts' strict interpretation of section 657 has been criticized as creating 'a "procedural minefield" for trial judges who issue new trial orders' " that may

---

**12** We note a new trial order shall be affirmed if it should have been granted upon another ground stated in the motion, other than insufficiency of the evidence or inadequate/excessive damages. (§ 657; *Oakland Raiders v. National Football League*, *supra*, 41 Cal.4th at p. 636.) U.S. Bank raised irregularity in the proceedings as another ground in its new trial motion. U.S. Bank included only the notice of motion in its appellant appendix, however; it did not include its memorandum of points and authorities. We, therefore, cannot evaluate the propriety of the argument as an alternate ground upon which to affirm the orders.

result in "unfairness to the successful moving party when the trial court's failure to file an adequate statement of reasons renders the order defective[,]" it nonetheless furthers the will and intent of the Legislature. (*Oakland Raiders v. National Football League*, *supra*, 41 Cal.4th at p. 635.) " ' "The power of the [L]egislature [in] specifying procedural steps for new trials is exclusive and unlimited. [Citations.] The wisdom of or necessity for certain requirements are matters for legislative and not judicial consideration . . . ." ' " (*Ibid*.)

If the order granting a new trial complies with the procedural requirements of section 657, we next review the reasons given by the trial court for abuse of discretion. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932-933.) "The reason for this is that the trial court, in ruling on the motion, sits not in an appellate capacity but as an independent trier of fact." (*Id.* at p. 933.) Section 657 further provides that an order granting a new trial for excessive damages shall be reversed "only if there is no substantial basis in the record for" the reasons stated in the trial court's specification of reasons.

2

*The "Duplicative Compensatory Damages" New Trial Order*

The jury awarded King $1 million for harm to his property, business, trade, profession, or occupation, and $4 million for harm to his reputation. King asserts the trial court erred in granting U.S. Bank's motion for new trial as to these defamation compensatory damages awards because: (1) the trial court applied the wrong legal standard when it stated the evidence did not clearly support the awards instead of finding the jury clearly should have reached a different decision; (2) the trial court did not specify its reasons as required under section 657; and (3) the record contains sufficient evidence to support the jury's damages awards. We disagree with King that the order fails to comply with section 657 but agree the trial court abused its discretion in granting the motion for new trial based on the reasons given.

45

a

*The Order*

The trial court conditionally granted U.S. Bank's motion for new trial on the issue of excessive damages relating to the defamation compensatory damages unless King accepted a remitted amount of zero.

U.S. Bank argued the damages for wrongful termination fully compensated King for harm due to the defamatory statements because the statements were not published or repeated outside the bank and thus could not have affected King's reputation outside the bank. It further argued there was no evidence the effects of the defamatory statements extended beyond his termination. King argued the jury was instructed not to award damages twice and evidence was presented that, after his termination, Gerlach mentioned King was in the Mafia and Murphy, a former U.S. Bank executive now working at Wells Fargo, heard rumors King was fired for an ethical issue.

The order contains the following statement of the court's reasoning: "The Court, in its independent judgment and in consideration of the entire record, finds that the evidence does not clearly support a compensatory damages award based on defamation. The evidence does not indicate the damages extended beyond [King's] termination and the compensatory damages awarded based on defamation are duplicative of those awarded based on wrongful termination. The Court has determined that reducing compensatory damages based on defamation [from $5 million] to $0 would be fair and reasonable based on the evidence at trial."

b

*King's Damages Evidence*

King presented the testimony of two experts on the issue of damages -- Charles Mahla, an economist, and Ricky Sarkisian, a vocational rehabilitation consultant. In Sarkisian's opinion, King's then current employment was a good representation of his present and future earning capacity, and his employment at U.S. Bank was a good

46

indicator of what his earning capacity "would have been and would have continued to be" absent his termination. Sarkisian's analysis was based on the available positions related to King's background. Sarkisian did not do an evaluation of King's emotional distress.

Mahla was asked to estimate the economic harm to King resulting from the termination. He calculated the harm by comparing what King would have earned in his position with U.S. Bank or in an equivalent position versus what King was earning in the position in which he was then employed. The loss and earnings were calculated through King's expected work life, ending at age 65. Mahla estimated King's total lost earnings and benefits at $4,826,781. The past lost earnings totaled $1,512,895 and the future lost earnings totaled $3,313,886. In addition, he calculated the loss of King's stock option grants to be $186,264. Thus, in his opinion, the total loss to King from the termination was $5,013,045.

c

*Jury Instructions*

The trial court instructed the jury: "Timothy King seeks damages from US Bank under more than one legal theory. However, each item of damages may be awarded only once regardless of the number of theories alleged. [¶] You will be asked to decide whether US Bank is liable to Timothy King under the following legal theories: [¶] 1, Defamation, libel and/or slander. [¶] 2, Wrongful termination in violation of public policy. [¶] And number 3, Breach of the implied covenant of good faith and fair dealing. [¶] The following items of damages are recoverable only once under all of the above legal theories: Lost past income. The following additional items of damages are recoverable only once for defamation and/or wrongful termination in violation of public policy: [¶] 1, Lost future income and mental anguish, humiliation and/or emotional distress."

The defamation claim, including the damages arising therefrom, was presented first in order on the special verdict form. The wrongful termination questions were

47

presented second. As to the wrongful termination damages, the special verdict form stated: "What are Mr. King's damages due to his discharge (*excluding any damages attributable to other claims*)?"

d

*Analysis*

We conclude the trial court's reasons in the new trial order comport with section 657. We understand the trial court determined the jury awarded compensatory economic damages twice for the same loss, rendering the $5 million defamation damages award duplicative of the wrongful termination damages as a matter of law. The trial court supported this determination with its finding that there was no evidence the defamation damages extended beyond King's termination. In other words, the defamatory statements led to King's termination and King could recover the economic losses arising out of the termination only once. Although the new trial order met the procedural requirements of section 657, we do not find a "substantial basis in the record for" the trial court's stated reasons. (§ 657.)

"Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. [Citation.] Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159.) "In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." (*Id*. at p. 1159.)

The $1 million for harm to King's "property, business, trade, profession, or occupation" as a result of the defamatory statements must have been based on the economic damages arising from his termination. There was no evidence that the

48

defamatory statements caused actual damage to King's profession or occupation other than those damages.

In that regard, Mahla testified King lost $4,826,781 in past and future lost earnings and benefits, and $186,264 in lost stock option grants. The jury's award of $1 million for the loss to King's profession and occupation arising out of the defamation, $200,000 for the lost bonus arising out of the breach of the implied covenant, and almost $2.5 million for the past and future lost earnings as a result of the wrongful termination collectively do not exceed King's evidence of his compensable economic damages. We thus cannot find, as a matter of law, that the jury awarded the same damages for the defamation and wrongful termination claims. There is nothing about the amounts themselves that suggest duplication and each of the damage awards is supported by substantial evidence. Moreover, the jury was instructed not to award duplicative damages. We presume the jury followed that instruction. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804 ["Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' "].)

As to the $4 million in reputation damages, we find no substantial basis in the record for concluding such damages were duplicative of the wrongful termination past and future lost earnings damages. U.S. Bank argues the reputation damages were duplicative because there was no evidence King's reputation had been affected by the defamatory statements and his termination was the "only discernible effect that the allegedly defamatory statements had on those individuals who did hear them." We disagree.

First, as King points out, there was testimony that statements impacting King's reputation were made *after* King had been terminated. In 2013, Gerlach told Walker somebody made an accusation that King was in the Mafia. Thakur and Flinn told Neal after King's termination that he had instructed them to falsify records. And Murphy

49

heard King was terminated for an ethical issue. Second, the damages awarded for the wrongful termination claim consisted only of past and future lost earnings "due to [King's] discharge." The wrongful termination damages did not include a component for reputation damages. Neither of King's experts testified that harm to his reputation formed a basis for their opinions; Mahla did not include any loss of reputation damages in his calculations of economic damages.[13] We, thus, do not find a substantial basis in the record that harm to King's reputation did not extend beyond his termination and that the reputation damages were duplicative of the wrongful termination damages.

For these reasons, we reverse the new trial order and reinstate the $5 million jury verdict. We note our review is limited to the reasons stated in the new trial order. (§ 657.) We accordingly do not independently determine whether the reputation damages award was excessive or unsupported by the evidence.

3

*The "Excessive Emotional Distress Damages" New Trial Order*

The jury awarded King $1 million for shame, mortification, or hurt feelings arising from the defamation. King asserts the trial court erred in granting U.S. Bank's motion for new trial as to this award because: (1) the trial court applied the wrong legal standard; and (2) the trial court did not specify its reasons as required under section 657. We agree the trial court failed to state sufficient reasons under section 657 and accordingly reverse the order.

The trial court conditionally granted U.S. Bank's motion for a new trial on the issue of excessive damages relating to the defamation emotional distress damages unless King accepted a remitted amount of $25,000. U.S. Bank argued the award was excessive

---

[13] We further note, although not evidence, King's counsel asked the jury for an award of $10 million for damage to his reputation during closing argument. He explained defamation never ends; "[i]t's floating out there."

50

because King stipulated that he had suffered only garden variety emotional distress and there was no evidence he experienced more than temporary moderate embarrassment and frustration. King argued the damages were not excessive because he asked for more money and he did not have to prove an exact amount of damages.

The order contains the following statement of the court's reasoning: "The Court, in its independent judgment and in consideration of the entire record, finds that the evidence does not clearly support the emotional distress damages award and the award is excessive. The Court has determined that reducing such emotional distress damages based on defamation [from $1 million] to $25,000 would be fair and reasonable based on the evidence at trial."

We agree with King that the order fails to contain a sufficient and proper statement of reasons under section 657. The order must "refer to evidence, not ultimate facts." (*Oakland Raiders v. National Football League*, *supra*, 41 Cal.4th at p. 635.) The trial court's statement "does not indicate the respects in which the evidence dictated a less sizeable verdict and fails even to hint at any portion of the record that would tend to support the judge's ruling." (*Stevens v. Parke, Davis & Co.*, *supra*, 9 Cal.3d at p. 62.) Thus, the court's statement does not go beyond the ground for the court's decision. (*Ibid*. ["statement that the 'verdict is excessive, that it is not sustained by the evidence' is . . . a statement of ultimate fact that does not go beyond a statement of the ground for the court's decision"].) We accordingly must reverse the new trial order and reinstate the jury's $1 million emotional distress damages for defamation.

B

*The Parties' Challenges To The Remitted Punitive Damages New Trial Order*

The jury awarded King $15.6 million in punitive damages. The trial court conditionally granted U.S. Bank's motion for a new trial as to the excessiveness of the punitive damages award unless King accepted a remitted amount of $2,714,696 --

51

applying a one-to-one ratio to the reduced compensatory damages.[14] King asserts the reduced award was not grossly excessive in violation of due process but, in his cross-appeal, argues the trial court's new trial order did not comply with the law because the court applied the wrong legal standard, the court failed to set forth its reasons for reducing the amount in accordance with section 657, and the jury verdict did not violate California law or federal due process. U.S. Bank asserts the remitted punitive damages award is unconstitutional and should be reduced.

1

*The Order*

In its motion for new trial, U.S. Bank argued the punitive damages award was unconstitutionally excessive; King disagreed. The order contains the following statement of the court's analysis and reasoning: "With respect to the reprehensibility factors, the Court in its independent judgment, and in consideration of the entire record, finds that the evidence clearly supports only a finding of low reprehensibility. The evidence indicates [King's] harm was not physical and his emotional distress was not sufficient to cause him 'physical' harm; there is no evidence [U.S. Bank] acted with a reckless disregard for the health and safety of others; there is no evidence [King] was financially vulnerable; and this was not a case of repeated wrongdoing, such as might be when the case involves

---

[14]    King accepted the remitted amount of $2,716,696, as stated in the new trial order; however, the trial court entered a nunc pro tunc amended judgment to correct an error in its mathematical calculation "which [wa]s stipulated to by the parties." The amended judgment reduced the total damages from the accepted remittitur of $5,433,392 to $5,429,392. Although the order does not spell out the mathematical error and the parties do not address it in their briefs, it appears the amended judgment amount was calculated by the sum of:  (1) $2,489,696 wrongful termination damages awarded by the jury; (2) $25,000 remitted defamation emotional distress damage; (3) $200,000 breach of the implied covenant damages awarded by the jury; and (4) $2,714,696 remitted punitive damages (based on applying a one-to-one ratio to the foregoing compensatory damages).

ongoing harassment or discrimination. The only reprehensibility factor the jury could have reasonably found is that the harm was caused by intentional malice.

"Accordingly, although the evidence supports the jury's verdict that [U.S. Bank] acted in a wrongful manner, the reprehensibility of [its] conduct was at the low end of the spectrum. The jury also awarded substantial compensatory damages, which also included a punitive element. Further, the Court considered [U.S. Bank's] financial condition. [Citation.] In such cases, . . . , a ratio of one to one might be the federal constitutional maximum. [Citation.]

"Accordingly, the Court finds the jury's award of $15,600,000 in punitive damages is excessive. The Court in its independent judgment, and in consideration of the entire record, has determined that reducing such punitive damages award to $2,716,696 would be fair and reasonable based on the evidence at trial." (Fn. omitted.)

2

*The Order Meets The Procedural Requirements Of Section 657*

We conclude the trial court stated reasons sufficient to comply with section 657. We can ascertain from the order why the trial court believed U.S. Bank's reprehensibility was at the low end of the spectrum. The trial court then determined that, considering the low reprehensibility determination and after considering the bank's financial condition, a one-to-one ratio was appropriate. The court's statement of reasons provides for meaningful appellate review.

We disagree with King's assertion that the trial court applied the wrong legal standard because it selected an amount of punitive damages it believed " 'would be fair and reasonable,' " rather than determining what the maximum award would be without violating due process. The trial court clearly stated that it believed a one-to-one ratio might be the federal constitutional maximum under the facts presented, and then applied that ratio to the compensatory damages. The court thus applied the correct standard.

53

### 3

*Challenges To The Remitted Amount*

U.S. Bank asserts the remitted punitive damages award is unconstitutionally excessive and should be reduced to a nominal amount because the compensatory damages award "is, by itself, sufficient to punish and deter." Alternatively, U.S. Bank asserts the award should be reduced by $200,000 because the implied covenant claim is not a tort and the jury did not find punitive liability for that claim. King argues the new trial order must be reversed and the jury verdict reinstated because there is no substantial basis in the record supporting the trial court's statement of reasons. King further argues the jury's punitive damages verdict is constitutional.

The parties' challenges initially present us with a question as to the standard of review. In reviewing the sufficiency of the new trial order under section 657, we must determine whether there is a substantial basis in the record to support the trial court's reasons in support of the new trial order. The constitutional excessiveness of a punitive damages award, however, presents a legal issue we review independently. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1187.) In determining whether the punitive damages award is constitutionally excessive, "we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct." (*Id.* at p. 1172.)

As explained *post*, we do not find a substantial basis in the record to support the trial court's finding that King did not suffer physical harm and that he was not financially vulnerable. When we independently review the constitutionality of the punitive damages award, however, we agree with the trial court that a one-to-one ratio is the federal constitutional limit under the facts presented.

## 4

### *A One-To-One Ratio Is The Federal Constitutional Limit*

We review the punitive damages award by applying the "three guideposts" set forth in *State Farm*: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 418 [155 L.Ed.2d 585, 601].) Because both parties discuss and rely on our Supreme Court's *Roby* decision, we set forth the pertinent facts and background below for context. (*Roby*, *supra*, 47 Cal.4th at p. 686.)

Before we delve into the analysis, however, we must address U.S. Bank's argument that the punitive damages analysis should not include the $200,000 awarded for the breach of the implied covenant claim. King does not address the argument. We agree with U.S. Bank. The jury's findings that U.S. Bank acted with oppression, fraud, or malice applied solely to the wrongful termination and defamation claims. Thus, the punitive damages analysis must be limited to those claims. (Civ. Code, § 3294, subd. (a) [punitive damages allowed in an action for the breach of an obligation not arising from contract when it is proven the defendant has been guilty of oppression, fraud, or malice]; see *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1084, disapproved of on other grounds in *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 379-382.)

### a

### *Roby*

In *Roby*, "[a] jury found that plaintiff employee, Charlene J. Roby, was wrongfully discharged based on her medical condition and related disability." (*Roby*, *supra*, 47 Cal.4th at p. 692.) Roby suffered from " 'panic attacks' that temporarily (and on short

notice) restricted her ability to perform her job." (*Id.* at p. 694.) Her employer instituted a complex attendance policy that "put particular emphasis on 24-hour advance notice for all absences, including medical absences." (*Ibid.*) The "attendance policy operated to the disadvantage of employees who, like Roby, had disabilities or medical conditions that might require several unexpected absences in close succession. Roby accrued a large number of occasions in a relatively short time span, and most of them were directly or indirectly related to her panic attacks. Roby's supervisors -- including defendant Karen Schoener -- were aware that Roby suffered from these unpredictable panic attacks and that many, if not all, of her absences without notice resulted from this condition." (*Id.* at p. 695.)

"Roby struggled to overcome her disability and to improve her attendance record, but after Schoener took over as Roby's immediate supervisor, Roby's frequent absences resulted in tension between them. Compounding this problem, Roby's medication caused her body to produce an unpleasant odor, and in connection with her panic attacks she also developed a nervous disorder that caused her to dig her fingernails into the skin of her arms, producing open sores." (*Roby*, *supra*, 47 Cal.4th at p. 695.)

"Schoener made negative comments in front of other workers about Roby's body odor, although Schoener knew from Roby that medication was causing the odor. Schoener also called Roby 'disgusting' because of the sores on her arms and her excessive sweating. Schoener openly ostracized Roby in the office, refusing to respond to Roby's greetings and turning away when Roby tried to ask questions, and Schoener made a facial expression of disapproval when Roby took rest breaks because of her panic attacks." (*Roby*, *supra*, 47 Cal.4th at p. 695.) Schoener also made other negative remarks to coworkers about Roby and treated her differently from the other employees, effectively excluding her from the team. (*Ibid.*)

Roby was terminated for failing to adhere to the attendance policy. (*Roby*, *supra*, 47 Cal.4th at pp. 696-697.) Her employer was aware that her absences were due to her panic attacks; Roby asserted McKesson applied the policy unevenly. (*Id*. at p. 696.)

"After the termination, Roby was devastated emotionally and financially. She depleted her savings and lost her medical insurance, which led her to forgo necessary treatment. She developed agoraphobia (anxiety in public places) and became suicidal. In 2001, the United States Social Security Administration found Roby to be completely disabled." (*Roby*, *supra*, 47 Cal.4th at p. 697.)

"The jury found both harassment and discrimination, and it awarded $3,511,000 in compensatory damages and $15 million in punitive damages against the employer, as well as $500,000 in compensatory damages and $3,000 in punitive damages against the supervisor who was responsible for the harassment. Defendants appealed." (*Roby*, *supra*, 47 Cal.4th at pp. 692-693.) This court, among other things, "concluded that the award of punitive damages against the employer exceeded the federal constitutional limit, and . . . ordered a reduction of punitive damages to $2 million." (*Id*. at p. 693.) Our Supreme Court disagreed that $2 million was the federal constitutional limit; rather, after applying the *State Farm* test, the court concluded a one-to-one ratio between compensatory and punitive damages was the federal constitutional limit. (*Roby*, at p. 719.) The court "note[d] in particular the relatively low degree of reprehensibility on the part of employer McKesson and the substantial compensatory damages verdict, which included a substantial award of noneconomic damages." (*Ibid*.)

b

*Degree Of Reprehensibility*

"[T]he most important [guidepost in evaluating the constitutionality of a punitive damages award] is the degree of reprehensibility of the defendant's conduct." (*Roby*, *supra*, 47 Cal.4th at p. 713.) "On this question, [we] consider whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an

57

indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Ibid*.) "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." (*State Farm Mut. Automobile Ins. Co. v. Campbell*, *supra*, 538 U.S. at p. 419 [155 L.Ed.2d at p. 602].)

*Physical Harm*. King argues the trial court abused its discretion by misapplying the law as to the physical harm factor because our Supreme Court in *Roby* equated emotional distress with physical harm. In *Roby,* our Supreme Court stated, "the harm to Roby was 'physical' in the sense that it affected her emotional and mental health, rather than being a purely economic harm." (*Roby*, *supra*, 47 Cal.4th at p. 713, citing *State Farm Mut. Automobile Ins. Co. v. Campbell*, *supra*, 538 U.S. at p. 419 [155 L.Ed.2d at p. 602].) U.S. Bank believes King is reading the sentence out of context. It relies on *Nickerson*, a recent decision by the Second District Court of Appeal, which states "*Roby* is distinguish[able] as the plaintiff there experienced physical manifestations of her emotional distress: she developed agoraphobia, became suicidal, forwent medical treatment, and was deemed 'completely disabled.' " (*Nickerson v. Stonebridge Life Ins. Co.* (2016) 5 Cal.App.5th 1, 17.)

We decline to read *Roby* to mean that emotional harm must result in physical manifestations to be considered "physical harm" for purposes of this reprehensibility factor; our Supreme Court said Roby's emotional and mental harm was " 'physical' . . . rather than being purely economic harm." (*Roby*, *supra*, 47 Cal.4th at p. 713.) Our

Supreme Court did not say it was physical in the sense that her emotional and mental harm resulted in physical manifestations. We read "physical harm" to mean harm to the person, something more than mere economic harm.

In this vein and in analyzing the "physical harm" factor, the Ninth Circuit Court of Appeals has explained that "punitive damages can -- and traditionally do -- consider the effects of the tortfeasor's conduct on the victim's mentality, not just his pocketbook." (*Exxon Valdez v. Exxon Mobile Corp. (In re Exxon Valdez)* (9th Cir. 2007) 490 F.3d 1066, 1086.) "The [United States] Supreme Court has recognized conduct causing emotional as well as economic harm can be more reprehensible than conduct causing mere economic harm." (*Id.* at p. 1085.)

Although we conclude King's harm was more than economic, we note his mental distress was not as severe as Roby's mental distress.

*Indifference To Or A Reckless Disregard Of The Health Or Safety Of Others.* King states U.S. Bank was indifferent to or recklessly disregarded King's health because "it was objectively reasonable to assume U.S. Bank's tortious acts would affect King's emotional well-being." King again relies on *Roby*. In *Roby*, our Supreme Court explained: "With respect to the second reprehensibility factor, it was objectively reasonable to assume that employer McKesson's acts of discrimination and harassment toward Roby would affect her emotional well-being, and therefore McKesson's 'conduct evinced an indifference to or a reckless disregard of the health or safety of others.' " (*Roby*, *supra*, 47 Cal.4th at p. 713.) We agree it is objectively reasonable to assume King's emotional well-being would be affected by the wrongful termination and defamatory statements; again, however, the indifference and reckless disregard did not rise to the level at issue in *Roby*. The employer in *Roby* knew the employee suffered from panic attacks and subjected her to despicable conduct in an employment setting where she observed and experienced the harassment personally over an extended period.

59

*Financial Vulnerability*. King argues he was financially vulnerable to U.S. Bank's tortious conduct because he was an employee. In *Roby*, our Supreme Court found Roby financially vulnerable because "Roby was a relatively low-level employee who quickly depleted her savings and lost her medical insurance as a result of her termination." (*Roby*, *supra*, 47 Cal.4th at p. 713.) Although King was not a low-level employee, he lost substantial income (and was unable to find a comparable position in terms of pay), lost stock options, had to liquidate his retirement savings, and had to move his family out of their home and into an apartment. Thus, we find this reprehensibility factor present. U.S. Bank argues "there is no evidence [it] targeted King *because* he was financially vulnerable." (Italics added.) That is not the pertinent question. The question is whether the target of the conduct *was* financially vulnerable. Here, the evidence shows King was.

*Isolated Incident Versus Repeated Actions*. Reprehensibility is "influenced by the frequency and profitability of the defendant's prior or contemporaneous similar conduct." (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1207.) We are looking for repeated corporate misconduct. King argues there were repeated actions because "[t]here were numerous defamatory statements, made by multiple publishers, on several different occasions," and U.S. Bank also unlawfully terminated King. U.S. Bank argues there was no evidence of a pattern of wrongful terminations and the defamatory statements "were several allegedly reprehensible acts in the series of events that harmed the plaintiff."

The torts at issue here were committed with respect to a single employment investigation. As in *Roby*, there is no evidence of repeated corporate misconduct or a corporate culture encouraging continued wrongful terminations or defamation. (*Roby*, *supra*, 47 Cal.4th at pp. 715-716.) We thus do not find this factor present.

*Harm Was The Result Of Intentional Malice/Accident.* This factor is of little value in assessing a California punitive damages award because "accidentally harmful conduct cannot provide the basis for punitive damages under our law." (*Simon v. San Paolo U.S.*

60

*Holding Co., Inc.*, *supra*, 35 Cal.4th at p. 1181.) We have already concluded *ante* that the jury's findings of malice, oppression, or fraud are supported by substantial evidence.

*Summary*. As in *Roby*, considering all five reprehensibility factors, we conclude U.S. Bank acted wrongfully -- warranting civil penalties -- but that its conduct nevertheless was at the low end of the range of wrongdoing that can support an award of punitive damages under California law. (*Roby*, *supra*, 47 Cal.4th at pp. 717-718.)

c

*Disparity Between Actual Harm And Punitive Damages*

The second guidepost is " 'the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award.' " (*Roby*, *supra*, 47 Cal.4th at p. 718.) The trial court reduced the compensatory damages award to $2,714,696; however, we reinstated the jury's defamatory damages award in its entirety *ante*. King's compensatory damages award is therefore $8,489,696 ($2,489,696 in wrongful termination damages and $6 million in defamation damages). Of this amount, the compensatory damages supported by the testimony of King's experts was $3,489,696 ($1 million defamation damages to business or profession and $2,489,696 for wrongful termination). The remaining $5 million consisted of a $1 million emotional distress award and a $4 million award for reputation damages. Although reputation damages may be viewed as an economic injury, King introduced no evidence of *actual* damage to his reputation; it appears the jury awarded presumed damages. The emotional distress and reputation damages "may have reflected the jury's indignation at [U.S. Bank's] conduct, thus including a punitive component." (*Roby*, *supra*, 47 Cal.4th at p. 718.)

As noted by our Supreme Court in *Roby*, "[i]n *State Farm*, the high court suggested that a ratio of one to one might be the federal constitutional maximum in a case involving, as here, relatively low reprehensibility and a substantial award of noneconomic damages: 'When compensatory damages are substantial, then a lesser

61

ratio, *perhaps only equal to compensatory damages*, can reach the outermost limit of the due process guarantee.' " (*Roby*, *supra*, 47 Cal.4th at p. 718.)

d

*Civil Penalties Authorized In Comparable Cases*

"Finally, we consider 'the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases,' the last of the three guideposts the high court set forth in *State Farm* . . . to assess the constitutionality of punitive damages awards." (*Roby*, *supra*, 47 Cal.4th at p. 718.) King asserts this guidepost is essentially irrelevant under the facts presented; U.S. Bank argues "[u]nder Labor Code section 203, which is the statute to which King tethers his public-policy claim, if [U.S. Bank] willfully failed to pay King wages due upon termination, his daily wages would continue as a penalty for up to 30 days." King responds the statute does not apply to the common law tort of terminating an employee for a reason that violates public policy.

This case involves " 'common law tort duties that do not lend themselves to a comparison with statutory penalties' "; the tort duty to not terminate an employee in violation of public policy does not "closely parallel[]" the statutory duty to timely pay wages owed to an employee who is discharged or who quits. (*Simon v. San Paolo U.S. Holding Co., Inc.*, *supra*, 35 Cal.4th at pp. 1183-1184; Lab. Code, § 203.)

e

*Summary*

We conclude a one-to-one ratio between compensatory and punitive damages is the constitutional limit under the facts of this case. King asserts "U.S. Bank's vast wealth requires a substantial award of punitive damages; otherwise, the award would have no

62

deterrent effect."[15]  As our Supreme Court explained in *Roby*, however, while the defendant's wealth is certainly relevant when applying federal constitutional limits to a punitive damages award, "the punitive damages award must not punish the defendant simply for being wealthy."  (*Roby*, *supra*, 47 Cal.4th at p. 719.)  "In applying the federal Constitution here, we have taken [U.S. Bank's] wealth into consideration, and more to the point we have taken into consideration the deterrent effect that is appropriate in light of [U.S. Bank's] wrongdoing.  We nevertheless conclude that punitive damages in an amount equal to compensatory damages marks the constitutional limit in this case and still provides the appropriate deterrence."  (*Ibid*.)

"Once a maximum constitutional award has been determined . . . a new trial on punitive damages would be futile."  (*Simon v. San Paolo U.S. Holding Co., Inc.*, *supra*, 35 Cal.4th at p. 1188.)  We thus order the judgment on the punitive damages award to be $8,489,696 -- a one-to-one ratio to the $2,489,696 in wrongful termination damages and $6 million in defamation damages.

### DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to:  (1) reinstate the jury's $1 million defamation award against U.S. Bank for harm to King's property, business, trade, profession, or occupation; (2) reinstate the jury's $4 million defamation award for harm to King's reputation; and (3) modify the punitive damages award against U.S. Bank to $8,489,696.  The judgment is affirmed as so modified.  King shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (3) & (5).)

---

[15]     During the punitive damages phase of the trial, Mahla testified regarding the bank's substantial assets, including that the bank's net earnings for one day is $15.6 million.

/s/ _____
Robie, J.

We concur:


/s/ _____
Hull, Acting P. J.


/s/ _____
Butz, J.*

_____

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.